**Thomas F. Armosino, OSB No. 911954**
Email: Armosino@fdfirm.com
**Casey S. Murdock, OSB No. 144914**
Email: Murdock@fdfirm.com
FROHNMAYER, DEATHERAGE, JAMIESON,
MOORE, ARMOSINO & McGOVERN, PC
2592 East Barnett Road
Medford, OR 97504
Phone: (541) 772-2333
Fax:    (541) 779-6379
  Of Attorneys for Defendant

**Eric B. Mitton, OSB 065925**
Of Attorneys for Defendant City of Medford
Medford City Attorney's Office
411 W. 8th Street, Room 260
Medford, OR 97501
(541) 774-2020
eric.mitton@cityofmedford.org
  Of Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| ANDRE BILODEAU, ROBERT BESSY, AMBER MCNAB, AND GREG KILLINGSWORTH, individuals, on behalf of themselves and all others similarly situated; and DOES 1 through 100,<br><br>                    Plaintiffs,<br><br>        v.<br><br>CITY OF MEDFORD,<br><br>                    Defendant. | Case No.:  1:21-cv-00766-CL<br><br>DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION<br><br>FRCP 23 |

/ / /

Page 1 – DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... 3-5

LR 7-1    .................................................................................................................. 6

SUMMARY OF FACTS SUPPORTED BY EVIDENCE.................................................7

    A.    SUPPORT FOR SHELTERS ....................................................................7

    B.    SUPPORT FOR OTHER SOCIAL SERVICES FOR UNHOUSED RESIDENTS ................9

    C.    SUPPORT FOR AFFORDABLE HOUSING  ...............................................9

    D.    THE CITY'S PROHIBITED CAMPING ORDINANCE
          AND THE LIVABILITY TEAM .....................................................12

    E.    THE CITY'S CIVIL EXCLUSION ORDINANCE ....................................16

    F.    CONCLUSION ....................................................................17

STANDARD  ..........................................................................................................17

RESPONSE  ...........................................................................................................18

THE PROPOSED CLASS.........................................................................................20

FRCP 23(a) REQUIREMENTS ...............................................................................25

    I.    NUMEROSITY ...................................................................25

          A. "PIT" COUNT.................................................................26

          B. SCHOOL SURVEY.............................................................27

    II.    COMMONALITY ...............................................................27

    III.    TYPICALITY ...................................................................38

    IV.    ADEQUACY OF REPRESENTATION ......................................40

FRCP 23(b) CERTIFICATION.................................................................................41

PLAINTIFFS' UNSUPPORTED FACTS SHOULD BE STRICKEN................................43

CONCLUSION.......................................................................................................45

# TABLE OF AUTHORITIES

## Cases

*Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289 (1979) ………...……..Page 37

*Baldwin v. Doe*, 2016 U.S. Dist. LEXIS 183864, 2016 WL 10649220
    (D. Or. Oct. 31, 2016)………………………………………………….......Page 6

*Blair v. Equifax Check Servs., Inc.,* 181 F.3d 832 (7th Cir. 1999) …......…………..Page 25

*Blake v. City of Grants Pass,* 2019 U.S. Dist. LEXIS 132508,
    2019 WL 3717800 (D. Or. Aug. 7, 2019) …………………………….Pages 18, 23

*Blake v. City of Grants Pass,* 2020 U.S. Dist. LEXIS 129494,......2020 WL 4209227
    (D. Or. July 22, 2020) ………………Pages 9, 12, 17, 24-25, 27, 33, 35, 36, 37, 39

*Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 957 (9th Cir. 2005) …………...…..Page 25

*Eusse v. Vitela*, 2015 U.S. Dist. LEXIS 167660, 2015 WL 9008634
    (S.D. Cal. Dec. 14, 2015)……………………………………………....…..Page 6

*Inhale, Inc. v. Inhale, LLC*, 2020 U.S. Dist. LEXIS 192145,
    2020 WL 6121942 (D. Or. Oct. 16, 2020)……………….…………...…..Page 6

*Lane v. Kitzhaber,* 283 F.R.D. 587 (D. Or. 2012) …………………………………Page 38

*Marks v. United States,* 430 U.S. 188 (1977) ………….………….……………..    Page 21

*Martin v. City of Boise,* 920 F.3d 584 (9th Cir. 2019) ……………Page 23,27,33,34,36,37

*Miranda Dairy v. Harry Shelton Livestock, LLC*, 2020 U.S. Dist. LEXIS 197775,
    2020 WL 6269541 (N.D. Cal. Oct. 23, 2020) ……………...……………..Page 6

*Montoya v. City of San Diego*, 2021 U.S. Dist. LEXIS 108191,
    2021 WL 2350927 (S.D. Cal. June 9, 2021) ……………….…....…………Page 17

*O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404 (C.D. Cal. 2000) ………………Page 17

*Parsons v. Ryan,* 754 F.3d 657 (9th Cir. 2014) ……………………..……….……..Page 28

*Pottinger v. Miami*, 720 F. Supp. 955, 960 (S.D. Fla. Jul. 21, 1989) ……….…..…Page 22

*Pottinger v. Miami*, 810 F.Supp. 1551 (S.D. Fla. Nov. 16, 1992) ………....Page 22, 23, 27

*Powell v. Texas*, 392 U.S. 514 (1968) ...............................................Page 20, 27

*Ramos v. United States Bank Nat'l Ass'n,* 2009 U.S. Dist. LEXIS 42946
2009 WL 1475023 (D. Or. May 20, 2009) ............................…..……….Page 41

*Resolution Trust Corp. v. Keating,* 186 F.3d 1110 (9th Cir. 1999) ………...……..Page 41

*Robinson v. California,* 370 U.S. 660 (1962) ……………………………..………..Page 20

*Sali v. Corona Reg'l Med. Ctr.*, 889 F.3d 623 (9th Cir. 2018) …………..……Page 19, 40

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ………..Page 17, 19, 27, 32, 37

### Statutes / Ordinances / Codes

ORS 195.505 (formerly ORS 203.079). ...........................................................Page 14

Ordinance 2020-113  .............................................................................. Page 9

Ordinance 2021-134  .............................................................................. Page 9

Ordinance 2021-157  .............................................................................. Page 7

MMC 5.256 .................................................................... Page 16, 32, 42, 44

MMC 5.257 ...........................................................Page 12-14, 32, 42, 44

MMC 5.258 ....................................................................Page 42, 44

MMC 5.296 ....................................................................Page 42, 44

MMC 5.557 ..................................................................Page 9, 42, 44

MMC 9.280, *et seq*  ....................................................................Page 11

MMC 10.825 .............................................................................. Page 8

### Rules

LR 7-1  ...........................................................................................Page 6

FRCP 23…………....…………………………………Page 17-19, 25, 38, 40, 42

ORPC 3.8…………………………………………………………….…..…Page 44

ORPC 4.3……………………………………………………………..………Page 44

## Other Authorities

Executive Order 2021-03 ........................................................................Page 9, 13

HB 3124 (2021) ........................................................................................Page 14

## LR 7-1

Plaintiffs certified that conferral occurred on this issue. Defendant, City of Medford, (hereafter "Defendant" or "City") was well-aware this Motion was being filed and had discussions about the timing of this Motion, but there was never any discussion related to the substance of this specific Motion. Plaintiffs did not seek Defendant's position, did not explain the foundation for the Motion, nor did they certify when or how this alleged conferral occurred.

The court "may deny any motion that fails to meet [the] certification requirement." LR 7-1(a)(3); *see, e.g., Inhale, Inc. v. Inhale, LLC*, 6:19-CV-01780-AA, 2020 U.S. Dist. LEXIS 192145, 2020 WL 6121942, at *4 (D. Or. Oct. 16, 2020) (denying motion for failure to comply with LR 7-1(a)); *Baldwin v. Doe*, 3:16-CV-00109-PK, 2016 U.S. Dist. LEXIS 183864, 2016 WL 10649220, at *1 (D. Or. Oct. 31, 2016) (going so far as denying *pro se* plaintiff's motion for failure to comply with LR 7-1).

Conferral is required. *Miranda Dairy v. Harry Shelton Livestock, LLC*, 18-CV-06357-RMI, 2020 U.S. Dist. LEXIS 197775, 2020 WL 6269541, at *1 (N.D. Cal. Oct. 23, 2020) (explaining that conferral "is not a meaningless formality, nor is it optional; instead, the purpose of a meet and confer requirement is for the parties to engage in a meaningful dialogue about their respective positions on disputed issues to see whether they can resolve (or at least refine) the disputes without court intervention, saving time and money for the litigants as well as the court system."); *see also Eusse v. Vitela*, Case No. 3:13-cv-00916-BEN-NLS, 2015 U.S. Dist. LEXIS 167660, 2015 WL 9008634, at *3 (S.D. Cal. Dec. 14, 2015) ("This process, when successful, 'obviates the need for unnecessary motion practice, which, in turn, conserves both the Court's and the parties' resources.'") (internal citation omitted)).

Here, there was no effort to comply with the rule. Defense counsel specifically sought information underlying the certification made to this Court that conferral occurred and received no response in the weeks prior to filing. (Decl. Murdock). Although the City highly doubts conferral would result in Plaintiff withdrawing the motion or Defendant conceding the motion, pre-motion conferral can result in more orderly, focused briefing. Based upon the above authorities, the Motion should be denied without leave to re-file. The City does not seek denial of this Motion without prejudice to Plaintiffs' re-filing. The City is briefing the matter in the event it is heard, despite the Local Rule violation.

## SUMMARY OF FACTS SUPPORTED BY EVIDENCE

### A.    SUPPORT FOR SHELTERS.

The City of Medford is a regional leader in innovative, progressive approaches to homelessness.  Starting in 2017, the City utilized City-owned property for Hope Village, a low-barrier tiny house transitional housing campground operated by Rogue Retreat sited on City property for $1 per year (effectively providing a financial subsidy to the operation).  (Operational Agmt. (Ex.1); Decl. Mitton) (summarizing discovery). In July 2020, the City of Medford created the Urban Campground, leasing private property (the real property obtained with City funds and through provision of City services to the property owner) for purposes of Rogue Retreat operating a low-barrier tent camping operation with wraparound services. *Id.* Since its inception, the Urban Campground has grown, and the City has obtained financial resources to acquire permanent land for the Urban Campground.  (Ordinance 2021-157 (Ex. 2); Decl. Mitton).  The City has also purchased two buildings on Market Street for purposes of a Navigation Center, a low-barrier shelter with wraparound services scheduled to open its doors on July 1, 2022.  (Decl. Mitton).  The

City has also financially supported the Kelly Shelter, a permanent low-barrier shelter operated by Rogue Retreat. *Id.*

Although there is not a vacant low-barrier shelter bed available for each and every unsheltered person simultaneously, Plaintiff's assertions in the Complaint and their Motion that there are no available shelter beds in the City of Medford is factually inaccurate. Weekly data on vacant shelter beds is tracked in the Livability Team weekly reports that were produced in the extensive class certification discovery in this case. For example, the report from the week of June 7, 2021 showed that the Urban Campground had 23 spaces available, the Kelly Shelter had 11 beds available, and the Gospel Mission had 28 beds available. For the week of August 30, 2021, the Urban Campground had 10 spaces available, the Kelly Shelter had 12 beds available, and the Gospel Mission had 29 beds available. Although these numbers typically decline in colder weather, even on the week of November 15, the Urban Campground had three pallet homes available, the Kelly Shelter had 3 beds available, and the Gospel Mission had 18 beds available. (Weekly Updates (Exs. 4-6); Decl. Mitton).

Furthermore, the City has pushed hard to increase options and availability of warming and cooling shelters. The City adopted a Severe Event Shelter provision in its Land Development Code in 2019. (MMC 10.825 (Ex. 7); Decl. Mitton). During the summer 2021, when no private providers offered to open a cooling shelter pursuant to that code, the City offered space at the City's Santo Center for the Senior Center's programming so that the Senior Center building across from Hawthorne Park could be used as a cooling shelter. (Decl. Mitton). Going into winter, when the Senior Center chose not to continue that relationship (the Senior Center is a separate entity from the City of Medford), the City of Medford pivoted and opened a warming shelter in a City-owned building, operated and staffed by ACCESS. (Decl. Mitton).

**B.    SUPPORT FOR OTHER SOCIAL SERVICES FOR UNHOUSED RESIDENTS.**

The City has done more than just support shelter development and affordable housing.  The City has provided substantial logistical and financial support to Medford's Project Turnkey and is converting a dilapidated motel into transitional and emergency housing, including a $420,500 funding agreement on November 4, 2021.  (Ordinance 2021-134).  The City also added two seats to its Community Services and Development Commission reserved for individuals with personal experience of homelessness, to ensure that those individuals have a voice in shaping funding recommendations and policy recommendations that that Commission forwards to City Council. (Ordinance 2020-113 (Ex. 9); Decl. Mitton).  The City successfully lobbied for the State of Oregon to lift restrictions on how many transitional housing campgrounds a City may have within its borders, allowing the City of Medford flexibility necessary to create the Urban Campground. (Decl. Mitton). The City provided staffing support to the joint effort of League of Oregon Cities and Oregon Law Center that drafted House Bill 3115, effectively the State of Oregon's codification of the spirit of the *Blake v. Grants Pass* decision. (Testimony (Exs. 10-11); Decl. Mitton).  The City created an ordinance allowing for lawful car camping with low-barrier regulation on private property and an executive order allowing for lawful car camping with low-barrier regulation in the public right-of-way, providing low-barrier service providers additional tools to provide services to homeless clients.  (MMC 5.557 (Ex. 12); Executive Order 2021-03 (Ex. 13); Decl. Mitton).

**C.    SUPPORT FOR AFFORDABLE HOUSING.**

Furthermore, Plaintiffs allege that the City is not sufficiently supportive of affordable housing development:

> The Medford City Council has voted against affordable housing projects that were proposed for development in the City, sometimes citing non-existent problems, like lack of parking, to explain their votes against affordable housing.

Page 9 – DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

(Mot. for Cert., p. 8). Legally, it is not clear how this allegation relates to the Eighth Amendment claim. Factually, the allegation is misleading. Unlike with the City of Grants Pass, there is no out-and-out denial of an affordable housing project immediately before the litigation.[1] Instead, as to the City of Medford, it is not clear what this is allegation is supposed to refer to. It might refer to a ten-year-old City Council vote on a project where the City of Medford ultimately worked collaboratively with the Housing Authority of Jackson County in a land swap deal that allowed HAJC to build the 100 units of affordable housing they wanted to build, albeit in two locations of 50 units each instead of one single location as originally proposed. As summarized by the Mail Tribune[2]:

> …the Jackson County Housing Authority settled on this property [the Concord apartments on Grape Street] after working out a deal with the city of Medford.
>
> Originally, the housing authority wanted to build a 100-unit Cherry Creek housing project on Spring Street. However, the project faced opposition from local residents and from the Medford City Council. After some negotiations, the Housing Authority reduced the size of the Spring Street complex from 100 to 50 units and transferred 2.5 acres of the 6-acre property to the city for parkland and a buffer between the complex and Spring Street. In exchange, the city agreed to swap the commercially zoned lot on Grape Street in the downtown for low-income housing. It was previously a city-owned parking lot, with a restaurant on one corner.

The City's participation in this innovative land swap helped make this affordable housing project a reality.

Since February 15, 2018, the City has not only been indirectly supporting affordable housing development (such as through the land swap discussed above), but directly helping fund

---

[1] https://kobi5.com/news/local-news/parking-issues-derail-low-income-housing-proposal-in-grants-pass-78132/

[2] https://www.mailtribune.com/since-you-asked/2016/04/04/concord-is-the-result-of-deal-making/

affordable housing development through the Affordable Housing Construction Excise Tax ("CET"), which taxes market-rate development to subsidize affordable housing development through the Housing Opportunity Fund. (MMC 9.280, *et seq*). The 2022 City of Medford Housing Opportunity Fund process is currently ongoing to distribute approximately $682,000 in CET proceeds, with applicants including CASA of Oregon (Summit Gardens), Housing Authority of Jackson County (Orchard Meadows and Prescott Gardens), Proud Ground (New Spirit Village), Providence Supportive Housing (supportive and recuperative care), and Rogue Retreat (Project Turnkey phase two). (Decl. Mitton).

More recently, on the evening of March 24, 2022, Medford Urban Renewal Agency Board[3] voted unanimously to execute an Option Agreement with Rubicon Edlen JV, LLC to help support the creation of a 144-unit affordable housing project at 711-801 North Central Avenue. (Decl. Mitton). The MURA contribution for this affordable housing project is estimated at $5 million.[4] As detailed in the agenda packet for the March 24, 2022 meeting, this vote a milestone achievement after of over two years of effort. Although this project is still contingent on certain outside issue such as Oregon Housing and Community Services providing a Low-Income Housing Tax Credit / Local Innovation and Fast Track grant award, MURA's option agreement, letter of support, and $5 million MURA financial support are essential steps of moving this project forward.

---

[3] Although MURA is legally a separate entity from the City of Medford, the MURA Board is made up of Medford City Council and the City's Mayor. (Decl. Mitton). Because Plaintiffs have alleged animus toward affordable housing by Medford City Councilmembers, those individuals' votes to support affordable housing development in Medford through MURA is relevant even though MURA is a separate entity.

[4] https://www.medfordoregon.gov/files/assets/public/medford-urban-renewal/agendas-amp-minutes/2022-mura/03-24-2022-agenda-packet.pdf

Taken together, there has been ongoing and consistent commitment from the City of Medford and its Councilmembers for supporting affordable housing.

### D.    THE CITY'S PROHIBITED CAMPING ORDINANCE AND THE LIVABILITY TEAM.

The City has approached affordable housing and homelessness with what it considers a forward-thinking approach. For historical context, this Court's opinion in *Blake v. Grants Pass* issued on July 22, 2020.  Given that the City of Medford's ordinance predated *Blake* and was not consistent with the *Blake* holding, the City almost immediately ceased prohibited camping enforcement; there were only two citations under that ordinance after June 2020 and before a post-*Blake* ordinance was unveiled in 2021. (Def. Resp. to Interrogatory No. 3; Bates MEDFORD 0026424 (Ex. 18)).  In February 2021, the City of Medford began seeking stakeholder and public feedback on a draft of a post-*Blake* prohibited camping ordinance that was not a citywide prohibition on sleeping on public property, but instead a set of time-place-manner restrictions that allowed individuals experiencing homelessness to lawfully sleep with bedding in many City parks and on many City sidewalks.  (MMC 5.257(3)-(5); *see also* 4/1/21 AIC from Def. Resp. to RFP No. 11 (Ex. 19); Decl. Murdock). Feedback was sought from the Housing Advisory Commission, a City commission that includes the executive director of Center for Nonprofit Legal Services. That commission voted in favor of the draft (the draft contained more restrictive provisions than what the City ultimately adopted). *Id.* Feedback was sought from the Community Services and Development Commission, a City commission that includes the executive director of Rogue Retreat. That commission also voted in favor of the draft. *Id.* Feedback was also sought from community members not involved in City commissions, through the Housing Task Force and through direct communications with local activists (including but not limited to communications through Mr. Rosas to activists he represents).

The ordinance ultimately drafted by Council is included verbatim on the Declaration of Eric Mitton filed herewith, but can be summarized as follows. As for lying and sleeping, the use of sleeping bags, bedrolls, and other bedding materials to keep warm and dry is authorized wherever lying and sleeping is allowed. Lying and sleeping in City parks is generally permitted, even during hours of park closure, although lying and sleeping on playgrounds, ballfields, and "school parks" (school playgrounds that double as parks during non-school-hours) is prohibited. (MMC 5.257(5)(b)). Lying and sleeping is permitted on sidewalks, so long as the individual leaves a path of travel of at least 36 inches. (MMC 5.257(5)(g)). During fire season, which is objectively defined, lying and sleeping is prohibited on Bear Creek Greenway, other Greenways, and Prescott Park, due to "a unique fire danger due to dry brush and abundant fuel sources." (MMC 5.257(2)(c)-(f) and (5)(a)). There are other specific prohibitions for lying and sleeping, such as public property not open to the general public (such as the wastewater treatment plant or the Public Works service center) (MMC 5.257(5)(e)), and in the I.O.O.F. cemetery (MMC 5.257(5)(i)).

"Camping" is subject to different restrictions than "lying and sleeping." The term "camping" is defined specifically as structure camping (tent camping or vehicle camping) or using a campfire, and does not include simply lying and sleeping with bedding. (MMC 5.257(1)(c)). So defined, "camping" is generally prohibited on publicly-owned property. (MMC 5.257(4)(a)). However, exceptions exist for organized-and-approved tent camping or car camping operations authorized through a variety of means. (MMC 5.257(4)(b)). The Urban Campground has been an organized tent-camping operation on City-leased property, and through Executive Order 2021-03, the City Manager authorized nonprofits to operate regulated vehicle camping operations in public right-of-way. (Decl. Mitton). In addition, there is a mechanism for loosening or lifting restrictions on structure camping during cold weather events. (MMC 5.257(4)(b)(iv)).

Page 13 – DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Before removing homeless individuals from an established camping site, the ordinance requires that notice be posted 72 hours in advance, subject to limited exceptions. (MMC 5.257(6), (10)). The ordinance then addresses how property is handled at the end of that 72 hour window. Items that have no value or utility, or are in an insanitary condition, can be immediately discarded. (MMC 5.257(7)(c)). Weapons, controlled substances, and items that appear to be stolen are retained by law enforcement. (MMC 5.257(7)(d)). Other property should be collected and stored for at least 30 days; property unclaimed after 30 days may be disposed of. (MMC 5.257(7)(a)-(b), (9)). These property handling provisions mirror state law as adopted by HB 3124 (2021). *See* ORS 195.505 (formerly ORS 203.079).

After it was adopted in April 2021, the City of Medford's enforcement of the time-place-manner restrictions focused on resources first, with enforcement as a last resort. The Medford Police Department's Livability Team will post a specific unlawful camp area with 72-hour notices. At those locations, resources (housing, mental health, addiction services, etc.) are brought in to engage the individuals in that area, bring awareness to living alternatives, and offer methods for recovery for any underlying medical, mental health, and/or addiction complications. (Decl. Lt. Kirkpatrick). At the end of the 72-hour notice period, property that has not been removed by the campers is cleared by City staff or contractors. Typically, only individuals who refuse to vacate the public property at-issue would be cited under the prohibited camping ordinance. (Decl. Lt. Kirkpatrick). This resource-first approach has proven successful; between May 1, 2021 and November 1, 2021, only 13 prohibited camping enforcement actions (of eight unique individuals) occurred. (Ex. 18). During that same time, there were 87 instances of individuals accepting referrals for services. (Weekly Update (Ex. 16); Decl. Mitton). The service providers involved in these weekly Medford Police Department Livability Team operations spoke positively about

working with the Livability Team in serving unhoused and unsheltered Medford residents. Options Mental Health Outreach (MHO) provided Council a written statement that stated in part:

> In 2021 with the support of the Livability team Options MHO was able to make contact with and begin to build relationships with 175 individuals; many with complex presentations such as serious and persistent mental illness, chronic substance use, serious medical conditions, families with young children and others with developmental disabilities such as down syndrome…the Livability team does an incredible job organizing community outreach, among many other things, which provide the opportunity for homeless individuals to work with community partners to stabilize and become productive members of society and effectively reduce the cost and burden on these systems.  MHO looks forward to continuing this very important partnership in services of our community.

(City Council study session of March 10, 2022, video at 12:28)[5].  Other community partners made similar comments about their positive experiences working collaboratively with the Livability Team during operations on the greenway. *Id*. at 40:45 onward. For example, Jackson County Mental Health's representative at the study session stated:

> I really appreciate the compassion that the Livability Team has demonstrated to a lot of our individuals, because we have gone out on multiple outreach attempts and there's been individuals that they have showed so much compassion and it has been amazing to watch that.  But then again they also allowed us to learn where these individuals are, and learn some of the different barriers they have so we can help them.

*Id*.

The Livability Team has operated in compliance with the City ordinance and is making a positive impact for community partners, the homeless population, and the community at-large. It is coordinating individuals with resources they may want or need to positively impact their living situation.[6]

/ / /

---

[5] https://medford.hosted.panopto.com/Panopto/Pages/Viewer.aspx?id=9cce277d-a6cc-4d97-80b1-ae55001f497b

[6] For those who do not want to utilize those resources, they would not fall within Plaintiff's proposed class of involuntarily homeless individuals.

Page 15 – DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

### E. THE CITY'S CIVIL EXCLUSION ORDINANCE.

The City of Medford has a civil exclusion ordinance that provides for a temporary civil exclusion, effectively a civil restraining order, from a particular public property as a result of behavior on the public property that interferes with the intended use of that property. Drinking in public, drug possession, assault, and similar offenses can result in a civil exclusion. These are behaviors that the City seeks to prevent in the downtown area and in City parks, regardless of whether the perpetrator is housed or unhoused. However, prohibited camping and trespass are not excludable offenses. (MMC 5.256(2)).

This ordinance has already been vetted through the judicial system. In a civil action brought by a local unhoused resident, Richard Harris, represented by attorney Bill Mansfield, the Circuit Court already had an opportunity to conduct full examination of the ordinance. The Jackson County Circuit Court, through the Honorable Benjamin Bloom, determined that the ordinance was constitutional as drafted, as a result of the due process in the ordinance and the exceptions that automatically apply to entering the exclusion area for constitutionally protected activities and reasons. As that Court summarized:

> The court determines that the Exclusion Ordinance survives constitutional challenge because although the Ordinance excludes individuals cited or arrested for an enumerated crime or violation from being in the downtown Medford exclusion zone for 90 days, the ordinance contains safeguards which render it constitutionally permissible. For instance a person subject to the Exclusion Ordinance may enter the exclusion zone to work or look for work, travel through the exclusion area, obtain health services, attend religious services, consult with an attorney or other legal professional, attend court hearings, go anywhere authorized or ordered by the court, attend public meetings, or otherwise exercise a constitutional right. The ordinance does not infringe upon the right to free speech, right to travel, or the right of assembly. Additionally, application of the Exclusion Ordinance is stayed if a person challenges an exclusion order. Finally, the Exclusion Ordinance contains provisions for a person to seek variances to the conditions of an exclusion Order.

(*Harris v. Medford*, Jackson Co. Case No. 17CV34435, Ord. Mot. & Cross MSJ, June 4, 2018 (Ex. 20); Decl. Murdock).

### F.   CONCLUSION.

Plaintiff seeks to impose *Blake* without accounting for these extensive factual distinctions between the City of Grants Pass and the City of Medford. The City of Medford has diligently and thoroughly pursued a resource-oriented approach to increasing affordable housing and pairing its homeless community with the means, tools, and locations to avoid enforcement of lawful ordinances. Those factual distinctions create a dispositive legal difference with *Blake*.

## STANDARD

As a threshold matter, Plaintiffs must define the class such that the members thereof are reasonable identifiable. *Montoya v. City of San Diego*, 2021 U.S. Dist. LEXIS 108191 at *7-8 (S.D. Cal.). Therefore, the "class definition must be 'precise, objective, and presently ascertainable.'" *Id.* at *8 (quoting *O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 416 (C.D. Cal. 2000)); *see also id.* ("'An adequate class definition specifies a distinct group of plaintiffs whose members can be identified with particularity.'")

The parties agree to the applicable test under FRCP 23(a): numerosity, commonality, typicality, and adequacy of representation. The proposed class must also fall within a category in FRCP 23(b). Plaintiffs assert that the proposed class meets the criteria of FRCP 23(b)(2). (Mot. for Cert., p. 6.) Plaintiffs have the burden of "affirmatively demonstrat[ing] [their] compliance with [FRCP 23] – that is, [they] must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (italics in original). The Court must conduct a rigorous inquiry of each requirement under FRCP 23(a) before certifying Plaintiffs' proposed class. *Id.* at 350-51.

("[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied[.]'"). Rule 23, therefore, mandates far more that simply meeting a pleading standard; there must be affirmatively proven facts. *Id.* at 350.

## RESPONSE

Plaintiffs filed this Motion without a shred of evidence in support. Plaintiffs cite to no declarations or exhibits.  In fact, Plaintiffs' Motion does not contain a single properly supported factual allegation. The only arguable attempt to cite to a statistic or evidence is a passing footnote to a random Excel spreadsheet available online. (Mot. for Cert., p. 7 n. 3.)[7]  Despite this Court providing a 45-day extension for these Plaintiffs to finalize class discovery and despite the City producing over 26,000 pages of discovery, Plaintiffs did not make any effort to incorporate that discovery to support their Motion. It is more concerning that the Motion is simply a copy-and-paste version of plaintiffs' motion for class certification from *Blake v. City of Grants Pass*, except Plaintiffs in this case (unlike those in *Blake*) have cited to no supporting declarations. (*Blake* Mot. for Cert. (Ex. 21); Decl. Murdock).

In tacit acknowledgement of this critical defect, Plaintiffs resort to caselaw stating the evidence "need not be admissible." (Mot. for Cert., p. 12). Yet, they fail to appreciate the distinction their own case law noted: the court does not want to impose trial risks "before a putative class may gather crucial admissible evidence." *Id.* Those risks do not exist here by reason of this Court's generous grant of seven (7) months to file this Motion and half-a-year to gather discovery

---

[7] To the extent inquiry is made into this spreadsheet, it appears to utilize the McKinney-Vento definition of homeless youth in schools, which includes any child living with someone who is not their legal guardian, including children living with grandparents where no guardianship proceeding was filed, or two families living together in a  single-family residence. The vast majority of the McKinney-Vento statistics on that spreadsheet are "doubled-up", rather than "unsheltered." Such statistics are irrelevant to resolving issues of involuntarily unsheltered homeless individuals living on the streets and potentially becoming clients of shelters or transitional housing operations.

specifically related to the issues plaintiffs must prove to establish class certification. Certainly, the evidentiary standards may differ here than what is used at summary judgment or trial, but there must be *some* evidence, particularly when these plaintiffs specifically sought obtained not only discovery related to class certification but merits discovery before filing the present Motion. (Nov. 4, 2021 e-mail (Ex. 22); Decl. Murdock). The Court allowed Plaintiffs more time to marshal the evidence together and went beyond that scheduling order, granting an additional 45-day extension to file the present motion against the backdrop of plaintiffs' representation that the time would be utilized "to review the voluminous information [the City] sent over prior to filing further pleadings in this case." (Feb. 22, 2022 e-mail (Ex. 23); Decl. Murdock) (bracketed language for clarity). This class certification motion was not filed by plaintiffs who were deprived of "crucial admissible evidence" like those in the authorities Plaintiffs' cite. While Plaintiffs appear to argue that supporting evidence need not be fully admissible, the cited case (even in the context of perfunctory discovery, if any) does stand for the proposition that there must be *some* evidence. *See Sali v. Corona Reg'l Med. Ctr.*, 889 F.3d 623, 632 (9th Cir. 2018). As the 9th Circuit stated, there must be "material sufficient to form a reasonable judgment on each [Rule 23(a)] requirement." *Id.*

Admissibility aside, Plaintiffs in this case have produced no material evidence such that a reasonable judgment regarding class certification can be made. Plaintiffs' Motion should therefore be denied because they have failed to meet their burden of affirmatively demonstrating that their proposed class meets the requirements of FRCP 23. *See Dukes*, 564 U.S. 338 at 350. As explained below, Plaintiffs' failure to provide supporting evidence permeates the analysis of each FRCP 23 requirement. They have failed to meet their burden and the Motion should be denied.

/ / /

/ / /

## THE PROPOSED CLASS

"Plaintiffs seek certification of a class consisting of all involuntarily homeless individuals living in Medford." (Mot., p. 11).  Plaintiffs proposed definition of the class is inadequate for at least two reasons: First, Plaintiffs fail to define the qualifier "involuntarily." Second, Plaintiffs produced *no evidence* that *any* of the members of the proposed class are "involuntarily homeless."

Plaintiffs' proposed class definition is neither precise, objective, nor presently ascertainable. Plaintiffs have provided no criteria by which the Court can determine whether any purported member is "involuntarily homeless." Moreover, by defining the class in this way, Plaintiffs have made a factual assertion about the members of the class without a shred of supporting evidence. In addition, defining the class in this way has significant legal consequences under Ninth Circuit and Supreme Court precedent.

In *Robinson v. California*, the Supreme Court held that a State violates the Eighth Amendment to the Constitution when it criminalizes a person for having an "affliction" that can be "contracted innocently or involuntarily," even if that person has not committed an act.  370 U.S. 660, 667 (1962); *see Id.* at 666 ("[W]e deal with a statute which makes the 'status' of narcotic addiction a criminal offense, for which the offender may be prosecuted 'at any time before he reforms.'").

The Supreme Court elaborated on *Robinson* in *Powell v. Texas*, 392 U.S. 514 (1968).  The appellant in *Powell* was a man who "was arrested and charged with being found in a state of intoxication in a public place, in violation of Texas [law]."  *Id.* at 517.  At trial, appellant's counsel argued that the appellant was an alcoholic, that "his appearance in public while drunk was not of his own volition," and therefore that, pursuant to the holding in *Robinson*, it would violate the Eighth Amendment to punish him.  *Id.* (alterations omitted).

Page 20 – DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

*Powell* was a 4-1-4 opinion. Justice White, who concurred in the judgment (affirming the appellant's conviction), wrote the controlling opinion. *Id.* at 548-554 (White, J. concurring in the judgment); *see Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.") (Internal quotations, citations, and ellipses omitted). The plurality opinion affirmed based on a strict distinction between the unconstitutional criminalization of a "status" or "condition," and the permitted criminalization of "acts." *See Id.* at 533-34. The four dissenters would have extended the holding in *Robinson* to cover conditions that are inseparable from "status." *Compare Id.* at 558 ("The sole question presented is whether a criminal penalty may be imposed upon a person suffering the disease of 'chronic alcoholism' for a condition – being 'in a state of intoxication' in public – which is a characteristic part of the pattern of his disease and which, the trial court found, was not the consequence of appellant's volition but of 'a compulsion symptomatic of the disease of chronic alcoholism.'"), *with Id.* at 567 ("Criminal penalties may not be inflicted upon a person for being in a condition he is powerless to change.").

Justice White, however, explained that a *fact-intensive* inquiry was required to address two questions pertaining to whether a statute that criminalizes public intoxication violates the Eighth Amendment as applied to a particular individual: First, whether the person has an uncontrollable compulsion to drink; second, whether that person has "no place else to go and no place else to be when they are drinking." *Id.* at 551 (emphasis added). Justice White explained that those people with no place else to go may be able to show that "resisting drunkenness is impossible *and* that avoiding public places when intoxicated is also impossible." *Id.* (emphasis added). Justice White

Page 21 – DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

concurred in the judgment because the record did not support the appellant's argument that he had no place else to go but a public place. *Id.* at 552-53 ("[N]othing in the record indicates that he could not have done his drinking in private or that he was so inebriated at the time that he had lost control of his movements and wandered into the public street.").

It follows that two factual criteria must be established before a court can conclude that the Eighth Amendment is implicated by a statute that criminalizes actions that are in some way related to a person's condition. First, the condition itself must be involuntary. Second, the person subjected to punishment for acts inseparable from his or her condition must establish that he or she could not have acted otherwise. These are fact-intensive questions that must be supported by the record. As applicable in this case, those questions are (1) whether Plaintiffs are involuntarily homeless, and (2) whether Plaintiffs have places to go other than the time-place-manner restricted areas to conduct necessary life activities. Plaintiffs seek to impose presumptions to sustain their case and class certification on both fronts.

In *Pottinger v. Miami*, a case similar to the one before this Court, the district court conducted such an analysis. 810 F. Supp. 1551 (S.D. Fla. 1992). The court found that the class of homeless people were involuntarily homeless based on evidence presented at trial. *Id.* at 1557-59 (1992) (citing expert testimony). The court's Order Granting Plaintiff's Motion for Certification of Class Action, however, did *not* certify the class as one of "involuntarily homeless people." *See Pottinger v. Miami*, 720 F. Supp. 955, 960 (1989) ("The class certified shall consist of homeless persons who reside or will reside on the streets, sidewalks, parks, and in other public places in [a bounded geographic area] who have been, expect to be, or will be arrested, harassed, or otherwise interfered with by members of the City of Miami Police Department for engaging in the ordinary

and essential activities of daily living in public due to the lack of other adequate alternatives.").[8] The court only concluded that the class of homeless people were involuntarily homeless after trial and based on evidence established therein. The district court also found as a factual matter that the class of homeless people could not conduct their ordinary and essential activities of daily living anywhere except for public places. *Pottinger*, 810 F. Supp. at 1558 ("At the time of trial, Miami had fewer than 700 beds available in shelters for the homeless. Except for a fortunate few, most homeless individuals have no alternative to living in public areas. * * * [T]his court has no difficulty in finding that the majority of homeless individuals literally have no place to go.").

Justice White's concurrence and the district court's opinion in *Pottinger* show that the "involuntary" and "no place else to go" inquiries are distinct. That is at odds with the court's evaluation of being "involuntarily homeless" in *Blake et al. v. City of Grants Pass*, 2019 U.S. Dist. LEXIS 132508, at *10 (Aug. 7, 2019) ("[T]he Ninth Circuit has defined involuntary homelessness as follows: a person is involuntarily homeless when 'there is a greater number of homeless individuals in [a jurisdiction] than beds available [in shelters].") (Quoting *Martin v. City of Boise*, 920 F.3d 584, 617 (2019)). *Martin* did not define "involuntarily homeless" with reference to the number of available beds in shelters. The context of that quote reveals that the court was discussing the second question – whether the homeless people in that case had anywhere else to go – not whether their homeless status itself was voluntary or involuntary. *See Martin*, 920 F.3d at 617 ("[A]s long as there is no option of sleeping indoors, the government cannot criminalize indigent, homeless people for sleeping outdoors, on public property, on the false premise they had a choice

---

[8] The district court's opinion after trial does describe the class as "involuntarily homeless people." 810 F. Supp. at 1555. However, that statement is clearly inconsistent with the court's order certifying the class which does not use the word "involuntarily" a single time, even when describing the plaintiffs' proposed class definition. *See generally Pottinger*, 720 F. Supp. 955.

in the matter.") (Internal footnote omitted).  In effect, *Blake* applied one fact (the number of available beds in shelters compared to the number of homeless people) to conclude *both* that the plaintiffs were involuntarily homeless *and* that they had no place to go but public spaces. Even if there was some evidence on either part of the evaluation, the legal test in *Blake* is inconsistent with the applicable case law that frames those inquiries as distinct.

More importantly, Plaintiffs obfuscate their own class definition by requesting relief that is narrower[9] than that contemplated by their proposed class definition. (*See* Mot. for Cert., pp. 9-10 (seeking injunction of enforcement of various ordinances and laws "unless and until Medford provides a place where plaintiffs can lawfully engage in necessary life-sustaining activities without requiring them to engage in religious services, *be subject to search and seizure or have a curfew*.") (Emphasis added).) This requested relief apparently applies only to a subset of the initially proposed class who seek to establish a Constitutional right to not comply with otherwise applicable law unless and until the City provides shelter without conditions for admission. *Cf. Blake*, 2020 U.S. Dist. LEXIS 129494, at *48 ("[T]his holding [does not] cover individuals who do have access to adequate temporary shelter, whether they have the means to pay for it or because it is realistically available to them for free, but who choose not to use it.") (Internal citations and quotations omitted). Therefore, it is unclear whether the proposed class is made up of the "involuntarily homeless" or instead the "involuntarily homeless who are currently unsatisfied with the preconditions to admission established by the shelters currently available to them."

In this case, Plaintiffs have made no effort to define "involuntarily homeless" or to introduce evidence that supports inclusion of any of the plaintiffs in such a class.  Furthermore,

---

[9] Or perhaps broader, depending on one's perspective.

because the ordinance is not a prohibition on sleeping anywhere on public property, but instead just time-place-manner regulations for certain discrete areas, Plaintiffs have made no effort to describe why violating these limited, specific restrictions should be considered "involuntary." Without a clear definition or supporting evidence, it is impossible for this Court to determine whether any purported plaintiff belongs to either interpretation of the proposed class. Moreover, by certifying Plaintiffs' proposed class on this record, the Court will necessarily decide two factual findings on critical legal issues *without any evidence whatsoever*. *See Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 957 (9th Cir. 2005) (explaining that a district court's determination on class certification often "sounds the death knell of the litigation," whether by dismissal, if class certification is denied, or by settlement, if class certification is granted) (quoting *Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 834 (7th Cir. 1999)). Plaintiffs' Motion should therefore be denied for lack of an adequate definition and for failing to introduce evidence to support any purported member's inclusion in either proposed class.

## FRCP 23(a) REQUIREMENTS

The parties agree that the applicable requirements under FRCP 23(a) are numerosity, commonality, typicality, and adequacy of representation.

## I.     NUMEROSITY:

The City is without knowledge of the number of members in the proposed class; that is, the number of involuntarily homeless or the number of involuntarily homeless who are refusing to accept shelter because they do not want to be subject to the rules imposed by the shelters, including

religion[10], pre-admissions screening, a curfew, and/or refusing to comply with the time-place-manner regulations that govern sleeping on public property.

Plaintiffs argue federal courts in Oregon presume numerosity exists where there are 40 or more members. (Mot. for Cert., p. 13). Plaintiffs then pivot and say they are only relying on future relief, so they do not even need to make the preliminary showing of 40 class members. *Id.* They then provided a proposed expanded class of "all involuntarily homeless individuals living in Medford, and those who would be living in Medford but for defendant's unconstitutional conduct." *Id.* Is this the class of "involuntarily homeless" or is it the subset of "involuntarily homeless" who refuse to utilize available resources and refuses to comply with time-place-manner regulations for sleeping on public property? The City and the Court should not be left guessing. The City intends to request leave to surreply if and/or when this is clarified.

Further, Plaintiffs attempts to establish the number of homeless individuals in Medford are unavailing because Plaintiffs resort to pure argument without any factual foundation.

### A. "PIT" COUNT:

The "PIT" count allegedly found 727 individuals "on the street" with another 2300 people who are "precariously housed." (Mot. for Cert., pp. 13-14). First, it is impossible to know whether these individuals are members of the proposed class because the PIT Count neither defines "on the street" nor "precariously housed" and because Plaintiffs' class definition is itself inadequate. Second, the PIT Count is improper evidence as unauthenticated argument. Third, it is County-wide without *any* specific reference to the City of Medford, and it is stated without any reference to time. Plaintiffs tacitly acknowledge at least one of these issues by making a conclusory and

---

[10] It must be emphasized that neither the Kelly Shelter, nor Hope Village, nor the Urban Campground, nor the currently-under-construction Navigation Center, have any religious requirement for their participants. There are other shelter options in the City of Medford, such as the Gospel Mission, that do.

unsupported argument that "hundreds of these people live in Medford." Such defective "evidence" and argument should not be found to sustain Plaintiffs' burden in showing numerosity.

### B. SCHOOL SURVEY:

In a similarly cavalier fashion, Plaintiffs refer to a Medford School District survey that (they argue) showed "1270 homeless youth" enrolled in the district. (Mot. for Cert., p. 14). The District's criteria and definitions are not provided. The standard could be completely different than the one imposed in the PIT count and/or the one contemplated by this Court or the parties. For instance, the spreadsheet itself states that the vast majority of "homeless" youth are doubled up, i.e., two families living in a home zoned as a single-family residence. "Doubling up" and other situations count as "homeless" for school statistic purpose fall well outside of the confines of the second inquiry under *Powell*, *Pottinger*, *Blake*, and *Martin* because they are provided beds and shelter. In any event, such speculation should not form the basis for class certification. Those afforded and availing themselves of the City's services (including beds) would be inappropriately included in even the broadest reading of this class.

Without any other stated basis, Plaintiffs have failed to establish numerosity for a clearly defined class.

### II.   COMMONALITY:

Rule 23(a)(2) requires "a common contention . . . of such a nature that it is capable of classwide resolution." *Dukes*, 564 U.S. at 350. A contention is common to all members if "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*  Again, the district court must engage in a "rigorous analysis" to determine whether Rule 23 has been satisfied. *Id.* at 351.

Plaintiffs cite to *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014) for the proposition that their burden is to simply show a single common issue of law *or* fact. (Mot. for Cert., p. 14). This is a shortsighted reading of Plaintiffs' burden. As the Ninth Circuit further stated in *Parsons*:

> In this case, as in all class actions, commonality cannot be determined without a precise understanding of the nature of the underlying claims. *See Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95, 185 L. Ed. 2d 308 (2013) ("Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." (citation omitted)); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) ("[T]he merits of the class members' substantive claims are often highly relevant when determining whether to certify a class."). As we recently observed, "[t]o assess whether the putative class members share a common question, the answer to which 'will resolve an issue that is central to the validity of each one of the [class members's] claims,' we must identify the elements of the class members's case-in-chief."

*Id.* at 676.

Therefore, to some extent, this Court may need to evaluate Plaintiffs' likelihood of success on the merits to determine commonality.

Plaintiffs fail to meet their burden. Plaintiffs refer only once to declarations in their entire Motion, and those declarations are unknown and unspecified. (Mot. for Cert., p. 8 ("They are, in fact, ticketed, fined and prosecuted for camping, sleeping and trespass as is evidenced by the attached declarations.").) If Plaintiffs seek to inject the assorted declarations that were attached to the Complaint, then they have failed to do so. Even if Plaintiffs intended to attach the declarations that were attached to the Complaint (none of which are declarations of the class representatives), those fall far short of establishing the facts necessary to find commonality. Taking each in turn:

1. Sherry Herndon – Ms. Herndon is a non-party to this suit. There is no explanation why she is not a Plaintiff already. Ms. Herndon described a voluntary drug overdose, being woken up at an unstated time by an officer after being admitted for treatment. She then

availed herself of the crisis center and chose to stay in a motel. She was kicked out of the motel for unstated reasons and left. There is no mention of any civil exclusion or unlawful camping.

2.  Jacqueline Renee Elgin – Ms. Elgin is another non-party to this case who stated she was arrested near Alba Park while drinking a beer. The basis for her arrest is unstated in this document, but the incident matches an arrest for a parole violation (no alcohol use). Elgin was also cited for drinking in public and a 90-day civil exclusion from the downtown district was issued on that specific basis. (Decl. Mitton (regarding MPD Case No. 19-12855)). She does not state that she is homeless or lacks housing and states nothing from which such a status can be inferred. There is no mention of unlawful camping.

3.  Tianna Carrier – Ms. Carrier is another non-party to this case. Her story is primarily about non-party City of Central Point's apparent burning of her property. Her only allegation regarding the City of Medford is her belief that the City should pick up trash in the greenway and that they should "light up the greenway more because there are more homeless people[.]" There is no mention of any civil exclusion or unlawful camping.

4.  Yolanda Caro-Quintero – Ms. Caro-Quintero is another non-party to this case. She states it is "fine" that an unspecified officer at an unspecified location was cleaning up trash. The unspecified officers at unspecified locations apparently took her property at an unstated time; they also "rev their engines" at night and it scares her. There is no mention of any civil exclusion or unlawful camping.

5.  Robert Hopkins – Mr. Hopkins is another non-party to this case. Mr. Hopkins said he picks up cans and bottles and puts them in grocery carts (presumably private property owned by and taken from a grocery or convenience store). That led to a citation. There is no mention of any civil exclusion or unlawful camping. His declaration contains an unsworn statement from "witness James Yarbrough" who wrote (in what appears to be the same penmanship) that an officer arrived and gave Mr. Hopkins a plastic bag to transport his cans.

6.  Kristan Hinkley – Ms. Hinkley is another non-party to this case. Ms. Hinkley said she tried to get in to an unspecified "assisted living facility" at an unspecified time. This was apparently on Avenue G or A (believed to be White City). For unstated reasons, she has been unable to secure assisted living, though she does not state over what period of time or what prevented her access. It is Plaintiffs' burden to prove why the shelter is inaccessible. She describes hearing noises at night and being hit by a paintball by an unspecified person. She believes some officers from some police department are lewd. She speculates she could not get into ARC or Rogue Retreat because of the officers' speculative influence. She said she is going to try "something other than Rogue Retreat", thereby specifically admitting other alternatives exist for her to obtain lodging and help.  There is no mention of any civil exclusion or unlawful camping.

7.  Burton Moreno – Mr. Moreno is a non-party to this case. Mr. Moreno argues a legal conclusion that he is "harassed" by officers. He argues he was told to leave downtown, being unable to access the library's wi-fi, but references no arrest or civil exclusion. He describes a collateral incident of being arrested related to an apparent stabbing. It is

unbound in time, making it impossible to know whether the challenged municipal codes applied during his alleged four years living in Medford.

8. Lonnie Wycherly – Mr. Wycherly is a non-party to this case. He describes a tent city set up in a City park. This particular City Park was closed to all members of the public on September 23, 2020, for purposes of cleaning, inspection, and repair. When he was asked to leave, he acknowledges he was provided a "resource list." He admits he had an outstanding warrant, and he was also arrested for trespass (being on property closed to the public), interference with a police officer, and resisting arrest. He makes allegations against the "Medford Jail," but the City does not operate a jail, and City records indicate that Wycherly was transported to Jackson County Jail. He admits there were resources provided to him that he chose not to utilize. Furthermore, the park closure resulting in a trespass arrest was at a specific park for a specific reason; even if Wycherly did not want to engage in resources, he could have relocated to a different park or other public space. (Decl. Mitton (regarding MPD Report 20-15603 Supplement 10)).

9. Damian Rankin – Mr. Rankin is a non-party to this case. He was arrested for an unspecified crime and released the following morning. He was also arrested for holding a "bubble", which was apparently drug paraphernalia. Other similar incidents have occurred with his drug paraphernalia, and he simply stated confusion about why the officers confiscated certain property, but not other property. There is no mention of any civil exclusion or unlawful camping.

10. Larry Rogers – Mr. Rogers is a non-party to this case. He states he was told to move when sleeping next to the public library. He acknowledges there are shelters and tent

villages available to him, but states they are "sometimes" not safe for people. He specifically crossed out the section asking him to certify that he was "displaced" by the City.

11. Marie Whaley – Ms. Whaley is a non-party to this case. She states she was at the local hospital and provided a room at a hotel. Despite being provided such room, she complains it was "dirty." She was then confronted by officers about an apparent report of armed robbery following her visits at Shiloh Inn and Purple Parrot. She admitted she pulled a knife on someone. She further admitted she was interacting with non-party Jackson County Sheriff's deputies. She does not state that she is homeless or lacks housing and states nothing from which such a status can be inferred. There is no mention of civil exclusion, unlawful camping, or Medford police.

Taken together, these declarations do not provide the factual basis for finding a commonality of interest with current Plaintiffs' allegations. In fact, they do precisely the opposite. They do not establish anything related to "unavailable" shelters, they do not say anything about warming or cooling shelters, making places "uninhabitable," state nothing regarding "removed park benches," and provide no factual support for the asserted class as it relates to MMC 5.256 and/or MMC 5.257.

Plaintiffs also argue that commonality exists because each Plaintiff is "subject to" the same laws and procedures utilized by the City. That is patently insufficient. The Supreme Court in *Dukes* noted that simply finding something in common with another prospective plaintiff is not enough. 564 U.S. at 549 ("That language is easy to misread, since '[a]ny competently crafted class complaint literally raises common 'questions.'"). Everyone in the City of Medford is "subject to" the ordinances and laws. That is, perhaps the crux of the issue. Plaintiffs are denying the City's

offered services on the basis that the "regulations" generated by those non-party shelters take away their "rights."

At the core of their claim – and frankly the only point of emphasis made in briefing - Plaintiffs assert the City has a custom, pattern and practice of "criminalizing" innocent, life-sustaining behavior. They then point to the four Constitutional claims raised: (1) cruel and unusual punishment under the Eight Amendment; (2) equal protection under the Fourteenth Amendment; (3) due process under the Fourteenth Amendment; and (4) insufficient notice.

This Court is well aware of the precedent set by *Martin v. City of Boise. Martin's* holding was extremely limited: we "hold that an ordinance violates the Eighth Amendment insofar as it imposes criminal sanctions against homeless individuals for sleeping outdoors, on public property, when *no* alternative shelter is available to them." 920 F.3d 584, 604 (emphasis added). The holding is not that a City may not impose appropriate time, place, and manner restrictions. It is not that the City must build shelters, it does not mandate the City to create pretrial discovery procedures for civil restraining order proceedings in municipal court, nor does it state that the Eighth Amendment is violated when a shelter is or even *may* be available to the homeless. Finally, it does not require that the City specifically attempt to match the number of beds available to an unknown number of voluntarily and involuntarily homeless individuals.

This Court considered a similar matter in *Blake v. City of Grants Pass*, where it agreed that *Martin* only addressed a situation where there were no available shelters available to the homeless population (and the ordinance banned sleeping on public property city-wide instead of establishing time-place-manner restrictions). 2020 U.S. Dist. LEXIS 129494, at *30. In *Blake*, the City of Grants Pass had no available shelters other than the Gospel Rescue Mission, which required

applicants to adhere to certain religion and forego outside work. This Court concluded its analysis

by reaching out to municipalities, stating:

> The holding in this case does not say that Grants Pass must allow homeless
> camps to be set up at all times in public parks. Just like in *Martin*, this holding
> in no way dictates to a local government that it must provide sufficient shelter
> for the homeless, or allow anyone who wishes to sit, lie, or sleep on the street
> at any time and at any place. *See Martin*, 920 F.3d 584, 617. Nor does this
> holding "cover individuals who do have access to adequate temporary shelter,
> whether they have the means to pay for it or because it is realistically available
> to them for free, but who choose not to use it." *Id.*, at n.8. The City may
> implement time and place restrictions for when homeless individuals may use
> their belongings to keep warm and dry and when they must have their belonging
> packed up. The City may also implement an anti-camping ordinance that is
> more specific than the one in place now. For example, the City may ban the use
> of tents in public parks without going so far as to ban people from using any
> bedding type materials to keep warm and dry while they sleep. The City may
> also consider limiting the amount of bedding type materials allowed per
> individual in public places.

*Id.* at *49.

Because the Grants Pass ordinance criminalized all sleeping on public property, there was

a commonality of issues among all homeless individuals. Since the City of Medford does not have

a city-wide prohibition but instead has specific time-place-manner restrictions, there is no similar

commonality between homeless individuals. An individual who erects structures on public

property outside of the ordinance's allowances may violate the ordinance, and an individual who

sleeps in the combustible vegetation of the Bear Creek Greenway during fire season instead of

sleeping in a City park may violate the ordinance. But a homeless person sleeping in the grass in

a City park does not violate the ordinance. And a homeless persons sleeping on a sidewalk

downtown does not violate the ordinance, so long as they leave a 36-inch path of travel. The City

of Medford's time-place-manner restrictions are not unavoidable in the way that Grants Pass' city-

wide prohibition was unavoidable. As such, there is no commonality among all homeless individuals.

In addition, City of Grants Pass did not have low-barrier shelters like there are in Medford. The City of Medford's Livability Team works collaboratively with community partners to repeatedly and persistently offer services, unlike those available to the homeless population in Boise or Grants Pass. Those other jurisdictions also did not allow any options for homeless individuals to lawfully sleep in parks or in sidewalks with bedding, unlike the City of Medford's current ordinance. The Court in *Blake* noted that the Federal government prohibited homeless individuals from camping on its land; the County prohibited homeless individuals from camping on its land; and that homeless individuals could not camp at rest stops under Oregon Administrative Rule. *Id.* at *24-25. Yet, these Plaintiffs are seeking to establish a Constitutional right to unconditional City-funded shelter.

While admittedly there are not currently low-barrier shelter beds for each and every unsheltered homeless person simultaneously (the legal threshold required for a city-wide prohibition, which to be clear, the City of Medford has not been implementing), there are typically at least some shelter beds, including low-barrier shelter beds, available on any given week (as summarized above). This makes questions of whether a particular individual is "unavoidably" homeless much more fact-specific and individual-specific than in *Blake v. Grants Pass* and weighs against class certification.

The irony here is that the City of Medford is specifically referenced in *Blake* as an exemplar to cure the Eighth Amendment violation(s) found in the City of Grants Pass. Taking from this Court's ruling:

The City of Medford, Oregon, has also developed new strategies for addressing the homeless crisis in its community. The City of Medford worked with Rogue Retreat, a nonprofit group, to open Hope Village in November 2017. Hope Village is the first tiny homes community in Southern Oregon that provides short term transitional shelter and case management for individuals and families to help move from homelessness into long term housing. The idea of Hope Village was created in 2013, when Rogue Retreat, St. Vincent DePaul, and the Jackson County Homeless Taskforce began researching and visiting other villages in Oregon to find creative ways to serve the homeless in Jackson County. Hope Village started with 14 units, each 8 feet by 10 feet, plus a communal kitchen, laundry and shower facilities. Hope Village began operating under a one-year agreement with the city, and in less than a year, the Medford City Council approved doubling the size of the village and signed a new, two-year agreement with Rogue Retreat. Medford city officials didn't create the project, didn't build the units, and doesn't operate the village. However, city leaders supported the concept from the beginning, offering a city-owned property for the village. When neighboring businesses and other property owners objected to that location, the City of Medford continued to offer support and encouragement, culminating in a new location. Hope Village now sits on property owned by the City of Medford and another property leased by Rogue Retreat. Residents of Hope Village are required to attend case management meetings, counseling sessions, and work on permanent ways to stay off of the streets. Rogue Retreat says the average stay at Hope Village is around four months, and the program has a 62 percent success rate. According to Rogue Retreat, this means 6 out of 10 people in the program successfully move away from homelessness.

*Id.* at *51-53.

Beyond this Court's prior appreciation of the City of Medford's efforts to address homelessness, neither *Blake* nor *Martin* involved such adaptive ordinances like those at-issue here.

As noted above, the City Ordinances were not only exemplars when *Blake* issued, but they were adapted specifically in light of *Blake* and *Martin's* guidance and instruction. The City's ordinances are not outright prohibitions, they are time-place-manner restrictions, the City offers extensive resources for its homeless population, it is collaborating with locations, stakeholders, and activists in finding and creating enforcement alternatives (including behavioral, mental, and

addiction assistance), and it withheld enforcement following *Blake* until an adaptive ordinance was enacted. The claim facially fails.

In addition to the clear defects noted above, the imminence plaintiffs are required to show must include an injury-in-fact. Although "a somewhat elastic concept," it nonetheless must be "*certainly* impending." *Martin,* 920 F.3d at 608. "A plaintiff need not, however, await an arrest or prosecution to have standing to challenge the constitutionality of a criminal statute." *Id.* "When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, [s]he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Here, due to the lacking evidentiary foundation, the commonality of imminence is also lacking.

Plaintiffs conclude by stating there is commonality because each Plaintiff is "subject to" the same laws and procedures utilized by the City. That is patently insufficient. The Supreme Court in *Dukes* noted that simply finding something in common with another prospective plaintiff is not enough. *Dukes*, 564 U.S. at 348-60. Everyone in the City of Medford is "subject to" the ordinances and laws. That is, perhaps the core defect. Plaintiffs are denying available services, including low-barrier shelter beds, despite the existence of laws prohibiting camping in certain areas at certain times and under certain conditions, on the basis that the "regulations" generated by those non-party shelters take away their "rights."

Commonality requires in-depth factual review, yet Plaintiffs failed to establish any. The City has shown it was in compliance with the Constitution pre-dating *Blake* and adapted its ordinances thereafter for certainty. These plaintiffs merely presented non-party declarations highlighting the

lack of commonality. There is no showing of common imminence. The only commonality here is speculation, which is insufficient to support a claim or class certification. The class should be denied.

## III.    TYPICALITY:

Under FRCP 23(a)(3), the "claims * * * of the *representative parties*" must be "typical of the claims * * * of the class." *See also Lane v. Kitzhaber*, 283 F.R.D. 587, 598 (D. Or. 2012) ("Although the claims of the class representative need not be identical to the claims of other class members, the class representative 'must be part of the class and possess the same interest and suffer the same injury as the class members.'")

To determine whether the class representative is part of the same class and possess the same interest as the class members, the court must first have evidence pertaining to the class representatives.  Plaintiffs have submitted no declarations from the class representatives at any point in this case. For that reason alone, it is impossible to determine whether the claims of the class representatives are typical of those of the members.

The declarations that Plaintiffs do attach to the Complaint serve one critical purpose: they prove that the factual backgrounds giving rise to distinct civil and criminal legal issues for each of the purported members of the proposed class are varied and sometimes complex. The absent class members testified to completely different circumstances giving rise to their frustrations. One was arrested for brandishing a knife while staying at a hotel; another was arrested for continually carrying drug paraphernalia for himself and others; another was upset that police took a store's property (a shopping cart) from him and gave him a plastic bag to transport bottles/cans; yet another complained that officers "rev their engines" while driving through public property at night. Plaintiffs' selected sampling of their own "class" reveals a lack of continuity and typicality.

Page 38 -- DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

In a further effort to avoid engaging the facts, Plaintiffs provide a conclusory argument that their experiences are typical of the proposed class because they want to "sleep and engage in other basic, life-sustaining activity without being awakened, moved-along, ticketed, fined or criminalized by defendants." (Mot. for Cert., p. 17). First, there is no way to determine whether those experiences are typical of the class because Plaintiffs have provided no evidence with their Motion as to what those experiences are, nor have they provided any evidence that shows those experiences are typical of the class representatives. Second, the declarations accompanying the Complaint fail to establish that the purported class members are unable to perform life-sustaining activities without experiencing the repercussions of which they complain. Third, as a factual matter, all members of this "class" can provide themselves with their requested relief simply by going to one of the many shelters available to them. *See, e.g.*, *Blake*, 2020 U.S. Dist. LEXIS 129494 at *51-52 (discussing with approval the City of Medford's strategies for addressing the homeless crisis and the numerous available shelters).

Because there must be a look at historical enforcement to evaluate future application as it applies to declaratory relief and/or an injunction and because plaintiff alleges a custom, practice, and policy of unequal enforcement, this case necessarily involves some retrospective view into the facts. The fact that available shelters have rules that do not comport with some of the class members' liking does not mean that there are no available shelters. For example, proposed plaintiff Travis Greiner was interviewed and stated, "I'm not a child. I don't need a curfew."[11] (YouTube; "Homeless Camp on Bear Creek Greenway Swept by Medford Police", at 14 minutes). He also stated that these shelters and resources, "definitely do not work for me." *Id.* He then said,

---

[11] https://www.youtube.com/watch?v=zuM85ScVSsc

"Anything that is religious based or supported; can't do."[12] He concluded, despite his statement about refusing to go to Urban Campground or a shelter, "They can say I'm denying their services all they want, but it's not like they're offering me keys or an opportunity to have my own roof." *Id.* at 14-15 minutes. He aptly summarized his interactions with the Medford Police Department Livability team: "They're pushing their narrative again, you know, bringing their resources out and getting their video log of, 'We have these options for you, we have these resources for you, would you like to use them?' 'No, I'm good.' 'Okay.' And that's pretty much it." *Id.* at 17 mins. That is the reality. The City is engaging its homeless population, it is helping make available services and resources, and while many are successfully engaging with those services and resources, some members of the homeless community. In any event, Plaintiffs never state that their refusal to avail themselves of these shelters due to the *de minimis* rules – such as a simple curfew – is also typical of the class. Even if it was the City's burden to prove this point – which it is not – the City should prevail.

Plaintiffs have wholly failed to show typicality, other than a bald argument that all residents in Medford, including the homeless, are subject to City ordinances.

## IV.    ADEQUACY OF REPRESENTATION:

Plaintiffs' proposed class fails for lack of adequate representation. Plaintiffs have failed to meet their burden to affirmatively show that the named Plaintiffs belong to the class they seek to represent. FRCP 23(a) ("*One or more members of a class* may sue or be sued as representative parties on behalf of all member * * *."); *see Sali*, 889 F.3d at 631 ("A plaintiff seeking class certification bears the burden of affirmatively demonstrating 'through evidentiary proof that the

---

[12] As previously noted, the Kelly Shelter and the Urban Campground are low-barrier (and thus do not have a mandatory religious participation requirement).

class meets the prerequisites of Rule 23(a).") (Internal quotations omitted). Therefore, Plaintiffs have failed to show that there are *any* representative Plaintiffs who can adequately represent the proposed class.

The Court retains discretion to question counsel's competency. The City challenges whether a conflict of interest may arise with the present Plaintiffs and the future class. Specifically, unknown, unnamed, and perhaps unnotified class members may be inhibited by the principle of collateral estoppel in future civil and/or criminal litigation due to this case's outcome.

Collateral estoppel, or issue preclusion, prevents re-litigation of a matter previously decided in a proceeding afforded preclusive effect. Here, plaintiffs may struggle to give proper notice of this claim to homeless individuals in the City and will particularly struggle to give notice to those outside the City who were "deterred" from living here. These individuals will have no idea their interests are being represented and they may be unwittingly legally precluded from pursuing their own claims and defenses in future proceedings.

"[I]ssue preclusion prevents parties from relitigating an issue of fact or law if the same issue was determined in prior litigation. *Resolution Trust Corp. v. Keating*, 186 F.3d 1110, 1116 (9th Cir. 1999). As Judge Anna Brown noted in *Ramos v. United States Bank Nat'l Ass'n*, 2009 U.S. Dist. LEXIS 42946 (D. Or. May 20, 2009), there is a real and substantial risk that a future litigant can and will be precluded as a result of prior class action proceedings.

Here, factual distinctions between the cases were previously shown. Plaintiffs present a moving target regarding their anticipated class. They are attempting to sweep in camping, exclusion, theft of public services ordinances and laws, and undetermined individuals may have completely unique factual circumstances giving rise to a different basis for attacking the laws,

rules, and/or regulations. Yet, they would be precluded by an outcome in this case. For that reason, a potential conflict exists and has not been addressed.

## FRCP 23(b)(2) CERTIFICATION

In addition to meeting the FRCP 23(a) requirements, Plaintiffs must also fall into one of the categories enumerated in FRCP(b). Plaintiffs only seek to qualify as a class on one provision of Rule 23(b)(2): "declaratory and injunctive relief they seek would provide final relief to each member of the class." (Mot. for Cert., p. 19).

Plaintiffs claim that their requested relief is "narrow." (Mot. for Cert., p. 9). Yet, they go beyond the scope of the "relevant ordinances" alleged in the Complaint and now argue they want to injunction on three municipal codes.[13] Specifically, the Complaint unequivocally recites that there are two "relevant ordinances": Medford Municipal Code ("MMC") 5.256 and MMC 5.257. (Compl., ¶¶ 32, 34 (*sic*).) In their Motion for Class Certification, however, Plaintiffs seek to expand the "web of ordinances" to include MMC 5.258, MMC 5.296, and MMC 5.557. (Mot. for Cert., p. 9). In addition, Plaintiffs' Motion requests relief from generalized "theft of services laws" and "move-along orders" solely involving involuntarily homeless individuals in Medford "who are engaged in the life sustaining activities of resting, sleeping or seeking shelter from the elements, unless and until Medford provides a place where plaintiffs can lawfully engage in necessary life-sustaining activities without requiring them to engage in religious services, be subject to search or seizure or have curfew." (Mot. for Cert., p. 10). Despite that requested relief they claim to seek,

---

[13] Plaintiffs refer to "move-along orders" in their Motion, but they never define the term. It would apparently include a common fact pattern where an officer might tell a homeless individual to "move along" when that person is involved in private-property trespass and the officer is issuing a warning instead of taking enforcement action. Prohibiting officers from issuing warnings under such circumstances would actually increase the number of enforcement actions taken against individuals experiencing homelessness.

Page 42 – DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Plaintiffs immediately reclassified their requested declaratory and injunctive relief in what can best be described as a shotgun approach to attacking a range of ordinances without facts or argument regarding them or how they tie in with the prospective class. (Mot. for Cert., p. 10). It is unclear whether plaintiffs know what they seek to prohibit.

Plaintiffs should not be certified under this rule because each incident is too fact specific to establish whether the City "acted or refused to act" on the same basis for each class member. Here, Plaintiffs hope to show that the City was simply acting by reason of the class members' status of being involuntarily homeless. Yet again, the declarations submitted with the Complaint, apart from failing to establish that any of the purported class members are "involuntarily homeless," directly contradict the conclusion that the City acted against them because of their purported status. Travis Greiner's statement shows that the City is facilitating access to resources that he refuses because of his individual aversion to even modest regulations when living on another's property, such as a private service provider imposing a curfew for its clients.

Certainly, some plaintiffs have been given notices to vacate public property due to City ordinances and some have gone through municipal court with varying outcomes. That, however, is insufficient for this class to be certified on Eighth, Fourteenth, and Fourth Amendment claims. They make no effort to do so with regard to any claim other than the one asserted under the Eighth Amendment.

## PLAINTIFFS' UNSUPPORTED FACTS SHOULD BE STRICKEN

Plaintiffs' Motion does not contain any properly supported factual allegations and did not properly cite to *any* evidence in their Motion. There is a passing reference to an unauthenticated Microsoft Excel spreadsheet that contains several numbers regarding allegedly unhoused individuals from several locations, without any reference to time or even preliminary foundation.

There are extensive "statistics" throughout the Motion that allegedly support the creation of this class, yet there is absolutely no evidence to support them.

Several conclusions couched as facts are also beyond the scope of the pleadings. Plaintiffs are seeking to certify a class based on facts, allegations, and ordinances not alleged in their Complaint. Again, the Complaint unequivocally recites that there are two "relevant ordinances": Medford Municipal Code ("MMC") 5.256 and MMC 5.257. (Compl., ¶¶ 32, 34 (*sic*)). In their Motion for Class Certification, Plaintiffs seek to expand the "web of ordinances" to include MMC 5.258, MMC 5.296, and MMC 5.557. (Mot. (ECF No. 21), p. 9). Plaintiffs make no effort to cite to those ordinances at any other point in their briefing. Therefore, the "statistics" and argument about "targeting" homeless individuals should be stricken or disregarded as beyond the scope of the pleadings and, separately, as factually unsupported.

Finally, there are several inflammatory, factually unsupported, and irrelevant allegations regarding the City Municipal Court and City Attorneys' compliance with the rules of professional conduct. (Mot., p. 9). Plaintiffs cite to no statute, rule of professional conduct, or other obligation requiring the court or the City to presumptively provide discovery to litigants in Municipal Court for civil proceedings, whether represented by counsel or not. And there is no such rule; the Rule of Professional Conduct requiring unilateral discovery without a discovery request is only for a "criminal case," (ORPC 3.8) but civil exclusion proceedings are civil restraining orders, not criminal cases. The general rule for dealing with unrepresented persons does not include any duty to provide unilateral discovery in civil cases. ORPC 4.3. Plaintiffs' counsel's allegations of ethics violations is an unnecessary and gratuitous attack on the court and counsel that has no place in this or any litigation.

/ / /

## **CONCLUSION**

For the foregoing reasons, the City asks this Court to deny class certification in this case.

Dated this 15th day of April, 2022.

FROHNMAYER, DEATHERAGE, JAMIESON,
MOORE, ARMOSINO & McGOVERN, PC,

 *s/ Casey S. Murdock*
Thomas F. Armosino, OSB #911954
Armosino@fdfirm.com
Casey S. Murdock, OSB #144914
Murdock@fdfirm.com
Of Attorneys for Defendant

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served the foregoing DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION

FOR CLASS CERTIFICATION upon:

>Justin N. Rosas
>justin@justinrosas.com
>Justina Lara
>justina@justinrosas.com
>THE LAW OFFICE OF JUSTIN ROSAS
>110 W. 11th Street
>Medford, OR 97501
> Attorneys for Plaintiffs

☒    by automatic electronic transmission via the Court's Case Management and Electronic Case Filing practice.

☒    by mailing to said attorneys a copy thereof, certified by me as such, contained in a sealed envelope, with postage paid, addressed to said attorneys at said attorneys' last known address and deposited in the post office at Medford, Oregon, on the date set forth below.

DATED this 15th day of April, 2022.

>FROHNMAYER, DEATHERAGE, JAMIESON,
>MOORE, ARMOSINO & McGOVERN, P.C.
>
> *s/ Casey S. Murdock*
>Thomas F. Armosino, OSB #911954
>Armosino@fdfirm.com
>Casey S. Murdock, OSB #144914
>Murdock@fdfirm.com
>Of Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** upon:

> Justin N. Rosas
> justin@justinrosas.com
> Justina Lara
> justina@justinrosas.com
> THE LAW OFFICE OF JUSTIN ROSASJU
> 110 W. 11th Street
> Medford, OR 97501
>  Attorneys for Plaintiffs

> Eric Mitton
> City Attorney's Office
> 411 W 8th Street, Room 332
> Medford, OR 97501
>  Attorneys for Defendant

☒    by automatic electronic transmission via the Court's Case Management and Electronic Case Filing system.

DATED this 15th day of April, 2022.

FROHNMAYER, DEATHERAGE, JAMIESON, MOORE, ARMOSINO & McGOVERN, P.C.

/s/ Casey S. Murdock
Casey S. Murdock, OSB No. 144914
Murdock@fdfirm.com
Of Attorneys for Defendant