**Justin N. Rosas, OSB #076412**
110 W. 11th St.
Medford, OR 97501
Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## MEDFORD DIVISION

| | |
|---|---|
| **ANDRE BILODEAU, ROBERT BESSY, AMBER MCNAB AND GREG KILLINGSWORTH, TRAVIS GREINER, RONDA BJORK,** individuals, on behalf of themselves and all others similarly situated; and DOES 3 through 100<br><br>        Plaintiffs,<br><br>v.<br><br>**CITY OF MEDFORD,**<br><br>        Defendant. | Case No. 21-766<br><br>**AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**<br><br>**42 USC § 1983** |

## COMPLAINT

1.    The City of Medford is trying to run homeless people out of sight, out of view, out of town or into the jail. On any given day or night, hundreds of individuals in Medford, Oregon are forced to live outside due to the lack of emergency shelter and affordable housing in their community. The City often misstates that many of those people refuse services. Most services are unavailable, have barriers and are only accessible through the Police Department. The most recent "point in time" count in Jackson County, a count that historically under-reports actual numbers, found 727 individuals on the street prior to

the pandemic and the Alameda Fire in 2020. Counts done by community organizations suggest that number has ballooned since March of 2020 due to economic and housing conditions in the Rogue Valley. There are countless individuals precariously housed for a total of more than 3,000 people who are homeless or at immediate risk of homelessness partially due to the Alameda Fire and the effect on the housing market. These numbers have remained relatively steady since the previous count.

2.    Medford has a severe affordable housing shortage and little or no emergency shelter for homeless people. The people living outside in Medford have nowhere else to go. Like all people, they require a place to rest, sleep, stay warm, and stay alive.

3.    This year, Medford's School District reported 2,200 homeless youth enrolled in the District, the second highest number in the state.

4.    Over a period of years, the City of Medford has taken coordinated steps to drive homeless people out of town. The City has refused or fought against warming stations in the frigid Oregon winters and cooling stations in the summer days reaching over 100 degrees with unbearable air quality due to smoke. Police have frequently patrolled the areas around such shelters and communicated to those running the shelters they would likely not be allowed to remain open. A number of prospective providers have been discouraged by the process. The City has placed barriers to those resting under overpasses, it has reduced the availability of public bathrooms and it has reduced available park seating.

5.    Last summer, after the Alameda fire, an emergency shelter was opened in the Presbyterian Church in downtown Medford. Unhoused people were not allowed into the shelter, only referrals from law enforcement and those who had lost homes from the fire. Law enforcement made no referrals to this shelter and nobody took refuge there. Only two

CLASS ACTION COMPLAINT

referrals came in the second night. Finally, the unhoused were allowed to seek refuge without a referral, filling the shelter while it was temporarily open.

6.    The City has enacted an exclusion zone for minor wrongs in the city's center, depriving many of reliable and humane access to social services. The types of minor wrongs that have led to exclusions include charging a cell phone on an outdoor power outlet, the non-criminal violation of possession of a controlled substance or publicly consuming marijuana downtown. Historically, the City has never provided an unhoused person facing exclusion with a public defender or pro bono attorney. Historically, the City has never provided discovery to those challenging their discovery and in nearly every instance it has been challenged until Attorney for the Petitioner had a hearing, the exclusion has been upheld. The City has routinely done sweeps of the unhoused, disrupting their lives and discarding their possessions. At the same time, the City Council has failed to secure funding for adequate affordable housing in the City. It has also failed to take steps to create a low-barrier emergency shelter for the hundreds of homeless people who live in the City. The only true low-barrier emergency shelter, the urban campground, is woefully inadequate, holding roughly 60 beds and often at full capacity. It was full within hours of opening last July. It also requires that residents be back to their campsites by 9pm, excluding many who would use the emergency shelter and requires that residents submit to unconstitutional search and seizure to stay there.

7.    Medford has enacted a web of ordinances, customs, policies and practices that, in combination,criminalize the existence of homeless people in the City. When people are found sleeping outside they are often awakened by police, told to move along, ticketed, ordered to appear in court, criminally fined and prosecuted for "illegal sleeping," "illegal

camping," theft of services (for charging cellular telephones on outdoor outlets),

disorderly conduct, interfering with a peace officer, exclusion zone violations and criminal

trespass. Medford's customs, policies and practices, as applied to involuntarily homeless

individuals, violate the constitutional rights to be free from cruel and unusual punishment,

to due process of law, and to equal protection of the laws, secured by the Eighth and

Fourteenth Amendments.  To exacerbate the constitutional violations, the City seeks to

enforce many of those laws in a Municipal Court which is not a court of record, provides

no pretrial or probationary services to those with mental health issues (instead placing the

honus on individuals to find their own treatment) or substance abuse issues. Further, more

than 95% of cases are litigated without an evidentiary motion or trial which is chilling.

8.     Plaintiffs seek injunctive, declaratory and all other relief the Court deems just pursuant to

42 USC § 1983. Amber Macnab, Andre Bilodeau, Robert Bessy, Greg Killingsworth,

Travis Greiner and Ronda Bjork bring this action for themselves and on behalf of all

similarly situated persons pursuant to Rule 23(b)(2) of the Federal Rules of Civil

Procedure. Plaintiffs ask this court to enjoin defendants from taking law enforcement

action against plaintiffs for sleeping, camping or simply existing in Medford unless and

until the City provides a lawful place for people to rest, sleep and find shelter.

### I. JURISDICTION AND VENUE

9.     Jurisdiction exists for the claim pursuant to 28 USC §§ 1331 (federal question) and 1343

(civil rights) in that plaintiffs' claims arise under 42 USC § 1983. Venue is proper in the

District of Oregon pursuant to 28 USC § 1391(b)(2) because the City of Medford is in this

district and the events giving rise to plaintiffs' claims occurred in this district.

## II. PARTIES

10.    Plaintiffs Amber Macnab, Andre Bilodeau, Robert Bessy, Greg Killingsworth, Travis
       Greiner and Ronda Bjork are and all similarly situated at all relevant times were
       involuntarily homeless residents of Medford, Oregon.

11.    Plaintiffs reserve the right to amend the complaint by substituting Does' true and correct
       names as they become known during the course of this litigation. Does 1 and 2 have
       been identified as Travis Greiner and Ronda Bjork.

12.    Plaintiffs' counsel submitted a records request and the City responded requiring more
       than $140,000 to produce documents related to unhoused enforcement. That should
       inform the Court that there is a large volume of enforcement activities. As plaintiffs
       become known, targeted records' requests will also lead to amending the complaint to
       include additional details about individual enforcement activities.

13.    Defendant City of Medford is a municipal corporation duly organized and existing under
       the laws of the State of Oregon. The acts were undertaken in the execution of customs,
       policies, and practices implemented or consented to by authorized policymakers of the
       City of Medford. The acts complained of were intentionally committed, ongoing, and
       will continue to be systematically committed unless restrained by this Court.

## III. FACTUAL ALLEGATIONS

A.    **Medford's Affordable Housing Crisis and Lack of Emergency Shelter**

CLASS ACTION COMPLAINT

14.    Medford is in the midst of an affordable housing crisis. There is not nearly enough affordable housing to house all of its residents. As previously noted, the 2020 Point-in-Time Count of homeless people in Jackson County found 727 individuals on the street. The school district numbers of 2200 unhoused students prove that count is clearly underreported. These numbers were taken prior to the pandemic and the local fires. Community organizations like the Maslow Project and Rogue Retreat have openly criticized the underreporting on numerous occasions. The majority of these people reside in Medford, the county's largest city.

15.    Unlike other comparable cities in Oregon, Medford has minimal low-barrier emergency shelter for homeless individuals.  There is not sufficient space for those who are unhoused to find shelter at the low-barrier shelters. The Rogue Retreat's Urban Campground, which has 60 total spaces and the Kelly Shelter, which has 54 beds, is at full and has a lengthy waitlist of more than 500 names. It is also facing a funding crisis and may be forced to close. Many of the other shelters are completely full or have minimal openings. We have been tracking openings at the shelters for months and those spaces have been greatly over reported by the City of Medford in its press releases and social media postings. There are many days where the Urban Campground is completely full and openings usually number less than 5 on the days where there is some space. The Urban Campground was opened in July of 2020. Residents there must return to the Campground by 9pm and are not permitted in or out after that time. We do not have a CAHOOTS program and instead use a law enforcement based "Livability Team" which makes arrests, writes citations and will help enforce the new Medford Camping Ban. Any admittance into a low-barrier shelter **requires** a referral from law enforcement.

CLASS ACTION COMPLAINT

Many unhoused people do not have faith or trust in law enforcement for a variety of reasons and those psychological barriers have been well documented in research literature.

16.    The shelters that have regular, open spaces for adults in Medford are run by the Gospel Rescue Mission. These shelters only allow people to stay for a limited duration, and they have many rules that exclude a majority of the unhoused.  There are no shelters at all for many groups of citizens and the urban campground often fills up.

17.    Stays at the Gospel Mission are limited to 30 days. The rules of the Mission run for several pages and include the following:

> If you have serious or chronic medical or mental issues that prevent you from participating in daily Mission life, you may not be able to stay at the Mission. Medications must be turned in at the front desk. You are to remain nicotine free during your stay at the Mission. There is no socializing between members of the opposite sex except at approved Mission events. Treat one another as a brother and/or sister. All intimate relationships other than legal/biblical marriage, regardless of gender, either on or off Mission property are strictly forbidden. Taking a sick day will result in losing pass privileges for 72 hours and confinement to staying indoors during this time to insure a thorough recovery from illness. Every Sunday, you are required to attend a church approved by the Mission staff. The individual church is your choice, however it must hold to traditional Christian teachings such as the Apostles Creed.

CLASS ACTION COMPLAINT

18.    If someone simply leaves for one day, there are not allowed to return for a day and come back any time for the following month. The Mission admits it is not a low-barrier shelter.

19.    The Kelly Shelter, run by Rogue Retreat, is a low-barrier shelter in Medford. It has 54 beds and a waitlist that ranges from a few weeks to a few months. There are essentially never openings for emergency shelter at the Kelly Shelter due to the waitlist.

20.    Even if all of the shelters were lower-barrier, there would not be nearly enough beds to shelter all of the homeless people in Medford. In total, there are generally 10-20 beds available (including the Medford Gospel Mission) and even those spaces are regularly filled to capacity.

21.    The City has recently proposed and passed a superseding statute governing prohibited camping, Medford Municipal Code 5.257. The City publicly and repeatedly acknowledged that its existing scheme was unconstitutional. The new statute prohibits camping anywhere in the City of Medford with a tent year-round. The City of Medford, through its attorney, expressed that people would be allowed to sleep only with bedrolls during the wet, cold Southern Oregon winter. Using terminology meant to instill fear of fires during the summer and proclaiming the statute was a reasonable time, place and manner restriction, the City passed a year-long city-wide ban on camping that included a months-long prohibition on even sleeping along the Bear Creek Greenway and a large percentage of public or park lands in Medford. The Greenway was the area the City of Medford said was the appropriate place for unhoused citizens to camp during the pandemic and feel safe to shelter in place. Having already excluded many of the unhoused from downtown and the city center, this prohibition combined with the residential neighborhoods that make up the remaining portion of Medford, the de facto

result of these bans is to make it unlawful to live outside and unhoused in Medford.

22.    Medford has no public housing and the wait list for a Section 8 voucher is 4-5 **years**. It is nearly impossible to get a housing voucher and if a person is so fortunate, there are very few places to use it.

23.    The housing crisis has made it so that most houses are off the market quickly at rates over market value. People experiencing housing insecurity are forced to couch-surf, live with friends, try and live out of vehicles and are slowly pushed, through a number of laws used predominantly against those experiencing housing instability to make it impossible to live in a vehicle and instead have to turn to temporary shelters.


**B.    Plaintiffs**

**Robert Bessy**

24.    Plaintiff Robert Bessy is involuntarily homeless and has been so for the past two years. He has lived in Medford for 9 years. About a year and a half ago, he lost his job and his housing and has been forced to live outside. Mr. Bessy cannot afford housing and there is no available bed for him at an emergency shelter anywhere in Medford.

25.    Mr. Bessy, over the past two years has been repeatedly told by Medford police that he must "move along" and that there is nowhere in Medford that he can legally sit or rest. He has been repeatedly awakened by Medford police while sleeping and told that he needs to get up and move.  He has been told by Medford police that he should go to Portland.

26.    He has no choice but to live outside and consequently, Mr. Bessy has faced ticketing, fines and criminal prosecution.

CLASS ACTION COMPLAINT

27.    Mr. Bessy was cited for theft of services by Medford Police Department for charging his cellular telephone on an outlet attached to a telephone pole in the public library parking lot. That violation was used to exclude him from downtown. He has struggled to maintain employment or use social services he needs since being excluded because his transit time has been extended. He also has a much greater fear that his possessions will be stolen if he leaves his camp.

28.    This week, Mr. Bessy has been repeatedly told by Medford Police Department officials that he will soon be forced to leave his current camp, across the creek from the Bear Creek Park on public land. He has been harassed at all hours of the day and night and told he needs to move along.


   **Greg Killingsworth**

29.    Plaintiff Greg Killingsworth is involuntarily homeless and has been so for the past nine years. He has lived in Medford for most of his life. About a year and a half ago, he lost his job and his housing and has been forced to live outside. Mr. Killingsworth cannot afford  housing and there is no available bed for him at an emergency shelter anywhere in Medford.

30.    Mr. Killingsworth has been displaced a number of times this year, having his possessions taken and largely destroyed three times in the past year due to enforcement activities by the City of Medford. He was removed from the 12th Street Bridge, the 10th Street Bridge and near the Willow Tree. In each of those sweeps, he lost many of his basic necessities and no longer has access to any items of familial or historic value like photographs, memories or mementos.

31.    Mr. Killingsworth has been warned this week that he must dismantle his tent and move to some imaginary shelter space or he will be cited and arrested for prohibited camping.

**Amber McNab**

32.     Ms. McNab has been unhoused in the Medford area for 10 years.

33.    She has been woken up and disturbed while sleeping on at least 500 her occasions by her count.

34.    Ms. McNab has been displaced and forced to move frequently. She details harassment such as parks and recreation vehicles using their horns or bright lights to harass the unhoused.

35.    Prior to the decision by the City to stop enforcing its previous unconstitutional statute, she was cited for Prohibited Camping and has also been cited for Trespassing.

36.    Ms. McNab is hopeful for permanent shelter but the current structure and rules of each of the shelters means that she is not a viable candidate for any of them.

37.    She has stayed in the shelters before and encountered unclean living, bedbugs, being stuck in a building for long periods of time and not allowed to leave, being locked in, having early lock downs, being forced to go to Church, having to agree to searches, agreeing to allowing law enforcement or staff to look at telephones, etc.

38.    She has now been told she has to move her tent and take it down or she will be arrested.

39.    Ms. McNab has witnessed and spoken with other unhoused community members that have already been displaced.

40.    Ms. McNab used the gazebo at Alba Park for shelter until being banned from that structure and downtown pursuant to the City's drive to push the unhoused out of downtown and onto the greenway areas.

41.    Ms. McNab estimates she has been forced to move hundreds of times in her ten years.

42.    Ms. McNab was raised here.


**Andre Bilodeau**

43.    Mr. Bilodeau has been unhoused intermittently for the last three to four years and living predominantly outdoors in the Medford area. He has witnessed law enforcement yelling at people in tents to move.

44.    Mr. Bilodeau has been yelled at and told to get up and out of his tent.

45.    Mr. Bilodeau has repeatedly requested additional trash containers or dumpsters in order to help throw away extra trash on the greenway. He has found that the regular pickups are not always made, making it harder to stay occupied and clean up the area.

46.    Mr. Bilodeau reports that having moved to the greenway from downtown because of the exclusion zone, he now feels like he has to stay near his camp more because of the volume of theft that happens along the greenway from other unhoused camps. He reports it more difficult to hold down employment because if he has to leave camp without someone to watch his things, he loses everything he has and he has to start over completely again. This leads him to do more canning and odd jobs to help him survive.

47.    He has been targeted by trespassing laws, the exclusion zone and is facing a possession of a controlled substance offense for a minor amount of a controlled substance.

48.    He estimates having been forced to move at least 10 times by the Medford Police Department and is trying to find somewhere to go because he is aware the tents are about to be destroyed.

49.    Mr. Bilodeau echoes Ms. McNab's difficulties in remaining at the shelter because of the lockdown hours, the fact that law enforcement has to make a referral, the religious requirements, the search requirements and the waitlists. He feels like there is nowhere for him to go.

### Travis Greiner

50.    Plaintiff Travis Greiner is involuntarily homeless and has been so for the past five years. He has lived in Medford for more than a decade. He works intermittently at hotels in the area but has trouble maintaining steady employment. Mr. Greiner cannot afford housing and there is no available bed for him at an emergency shelter anywhere in Medford.

51.    Mr. Greiner, over the past two years has been repeatedly told by Medford police that he must "move along" and that there is nowhere in Medford that he can legally camp without a curfew, having to attend religious services and/or having to submit to search and seizure.  He has been repeatedly awakened by Medford police while sleeping and told that he needs to get up and move.  He has been told by Medford police that he should go to Portland or move to California. He was told he would be the first person swept under the new ordinance by a Medford Police Department Officer because he had spoken out at a City Council meeting about the treatmenet of the unhoused.

CLASS ACTION COMPLAINT

52.    He has no choice but to live outside and consequently, Mr. Greiner has faced ticketing, arrest, jail time, loss of property, harassment, fines and criminal prosecution. His friends and family have been arrested, ticketed and harassed as well.

53.    Mr. Greiner was cited for prohibited camping and possession of a controlled substance (violation) by the Medford Police Department for there being an alleged, small, resinated amount of methamphetamine left in a pipe near a camp he was sleeping in . That violation was used to exclude him from downtown. He has struggled to maintain employment or use social services he needs since being excluded because his transit time has been extended. He also has a much greater fear that his possessions will be stolen if he leaves his camp.

54.    Mr. Greiner had his camp swept despite having nowhere to go during one of the hottest weeks of the summer. The Government failed to appropriately safeguard his property and has continued to harass him to this day, citing him with car camping and prohibited camping on a number of occasions.

55.    Mr. Greiner was a leader and a voice in the unhoused community. He has appeared in numerous media interviews as a leader and spokesman for the community including news outlets from Medford to Portland and out to Eastern Oregon. He lived in a camp that was known as a community center during the pandemic and Counsel can confirm that the fifteen or so people camping near Mr. Greiner were supportive of his participation in this suit to be a voice for their grievances as well.

**Ronda Bjork**

56.    Plaintiff Ronda Bjork is involuntarily homeless and has been so for the past ten years.

14 of 32    CLASS ACTION COMPLAINT

She has lived in Medford for almost her entire life. She is unable to find or secure employment. She has been kicked out of all of the available shelters. Ms. Bjork cannot afford housing and there is no available bed for him at an emergency shelter anywhere in Medford.

57.    Ms. Bjork, over the past ten years has been repeatedly told by Medford police that she must "move along" and that there is nowhere in Medford that she can legally sit or rest. She has been repeatedly awakened by Medford police while sleeping and told that she needs to get up and move.

58.    She has no choice but to live outside and consequently, Ms. Bjork has faced ticketing, fines, arrests, exclusion, deprivation of property, deprivation of her right to discovery and to counsel and criminal prosecution.

59.    Ms. Bjork was cited for a number of violations including prohibited camping, possession of a controlled substance, car camping and other violations and minor offenses by Medford Police Departmen. In her most recent exclusion zone notice, she was cited for a possession of a controlled substance despite no evidence linking her to a resinated pipe when the officers decided they could not stick the charge on Mr. Greiner. She has struggled to maintain employment or use social services she needs since being excluded because her transit time has been extended and she lost much of her property. She is also just afraid of more nforcement.

60.    Ms. Bjork has had her property swept under the new ordinance despite not receiving sufficient notice, has lost her property to destruction at the hands of those helping the Livability Team, faced numerous citations absent probable cause and was issued an

==exclusion zone notice to be kicked off of the Greenway on the basis of a charge that had==
==no probable cause. She has been unlawfully detained and excluded.==

### C.    Medford's Efforts to Chase Homeless People Out of Town

61.    On a daily basis hundreds of homeless Medford residents are living in theidentical situation as the Plaintiffs. They are awakened throughout the night and morning and given "resource fairs" with resources that do not exist or have lengthy waitlists. They are moved along. They are told that they cannot sleep outside. They are chastised by law enforcement. They are told they will be the first to move. They have been and will soon be more frequently ticketed, fined, prosecuted and jailed for existing outside in Medford under the new ordinance. It goes without saying that this inhumane, systematic abuse is beyond detrimental to the mental health of all Plaintiffs and the unhoused community.

62.    Counsel and associated investigators have contacted the "resources" on flyers provided during those fairs to the unhoused. Many did not provide the services listed and one business expressed dismay and anger that they had been included without being contacted given that they would be disappointing many who were reaching out for life support.

63.    The City of Medford has taken additional affirmative and intentional steps to remove unhoused people from its borders. The City has placed barriers so that people have no place in public to rest. The City has suggested the unhoused members of its community should go back to where they came from despite many of our declarations being from long term Oregonians. There have been numerous sweeps of homeless encampments including sweeps during the pandemic in which City officials had said they would allow the unhoused to rest-

in-place. City representatives and officials have made insinuations that unhoused members of our community are being paid by out of area activists to come here and attempt to manipulate a news narrative. This conspiracy has no merit. City representatives and officials have overstated the amount of pollution, used misleading press releases and manipulated photographs to discuss the dangers and created a more dangerous situation for those who are living unhoused.

64. The City has made it difficult or impossible for any organization to operate a warming or cooling center for homeless people anywhere within the City. Those that have opened have often not re-opened after a myriad of complaints and interventions by the City.

65. The Medford City Council has failed to secure affordable housing projects in the City. When a previous City Attorney proposed taking away a bank's right of redemption on vacant buildings so that the City could finally meet its duties to its unhoused citizens, the Council rejected the idea. Describing the problem and the use of criminalization to solve it as a "Groundhog Day" like failure to address the true problems that would only lead back to more unhoused, more public sleeping and a need for more and more jail beds in a significant presentation to the Council, the City Attorney's suggestions were roundly rejected. Ideas that would have humanely confronted the issue instead of using incarceration to sweep it out of view, deepening the crises our unhoused neighbors find themselves in and proving costly and ineffective for the rest of us.

66. Several elected officials have publicly stated their desire to drive homeless people from the City and to make it difficult for homeless people to live in Medford.

**D.      Relevant Ordinances**

67.    City of Medford Municipal Code 5.256 "Civil Exclusion Zones" provides, inpart:

>    (1) **Civil Exclusion Zones.**  Civil exclusion zones are designated to
>    protect the public from those whose illegal conduct poses a threat to the
>    public health, safety, and welfare.  In accordance with the provisions of
>    this section, the Chief of Police or designee may exclude any person
>    who is cited to appear, arrested, or otherwise taken into custody for any
>    offense listed in subsection (2) of this section within a civil exclusion
>    zone.  Nothing in this section shall be construed to authorize the
>    exclusion of any person lawfully exercising free speech rights or other
>    rights protected by the Oregon or federal constitution.  However, a
>    person engaged in such protected activity who commits acts that are not
>    protected shall be subject to exclusion as provided by this section. Civil
>    exclusion zones include the following places:(a) City Property. Any
>    property owned or managed by the City, including but not limited to
>    parks, greenways, buildings, parking lots, or other land or physical
>    structures.  A person shall only be excluded from the city property that
>    the person receives a notice of exclusion for.
>    (b) **The Downtown District.**  Comprises the area bound by Bear Creek,
>    the north right-of-way of Sixth Street, the west right-of-way of Oakdale
>    Avenue, the north right-of-way of West Main Street, the west right-of-
>    way of Laurel Street, the south right-of-way of West Eighth Street, the
>    west right-of-way of Oakdale Avenue, and the south right-of-way of
>    West Tenth Street (as shown on Map A).(2) Offenses; Penalty.  A
>    person is subject to civil exclusion for a period of 90 days from entering
>    or remaining within a civil exclusion zone if that person has been cited
>    to appear, arrested or otherwise taken into custody within a civil
>    exclusion zone for any of the following offenses:(a) alcoholic liquor
>    violations as provided in the Oregon Liquor Control Act, or Medford
>    code sections 5.310, 5.350, 5.360, or 5.361;
>    (b) any sexual offense, as provided by ORS 163.355 through 163.465;
>    (c) arson or related offenses as provided in ORS 164.315 through
>    164.335;
>    (d) assault as provided in ORS 163.160, ORS 163.165, ORS 163.175,
>    ORS 163.185, or Medford code section 5.105;
>    (e) criminal mischief as provided in ORS 164.345 through 164.365 or
>    Medford code section 5.270;
>    (f) disorderly conduct as provided in ORS 166.025 or Medford code
>    section 5.120;
>    (g) discharge of weapons as provided in Medford code section 5.160
>    (h) failure to control dangerous dog as provided in Medford code
>    section 5.603.

(i) graffiti offenses as provided in ORS 164.381 through ORS 164.386 or Medford code section 5.519;

(j) harassment as provided in ORS 166.065 or Medford code section 5.130;

(k) intimidation as provided in ORS 166.155 through 166.165;

(l) marijuana-related offenses as provided in the Control and Regulation of Marijuana Act, the Oregon Medical Marijuana Act, or Medford code sections 5.652, 5.653, 5.705, 5.710, or 5.715;

(m) menacing as provided in ORS 163.190 or Medford code section 5.110;

(n) possession, manufacture, or delivery of a controlled substance or related offenses as provided in ORS 167.203, ORS 475.005 through 475.285, and ORS 475.752 through 475.980;

(o) prostitution or related offenses as provided in ORS 167.007 through ORS 167.017;

(p) public urination as provided in Medford code section 5.125, except if the conduct involves only urination on a permeable surface in a park or greenway;

(q) recklessly endangering another person as provided in ORS 163.195 or Medford code section 5.115;

(r) strangulation as provided in  ORS 163.187;

(s) theft as provided in ORS 164.015 through 164.140 or Medford code sections 5.291 through 5.298.(3) Violation. (a) If a person excluded from a civil exclusion zone is found within the boundary of the civil exclusion zone during the exclusion period, that person may be arrested for Trespass-Premises as provided in Medford code section 5.250.  A person is not considered to be within a civil exclusion zone if the person is within an exclusion zone and the person is: (i) passing through the exclusion area;(ii) in the act of obtaining social, medical, or like services;(iii) in the act of seeking employment or performing work directly related to lawful employment;(iv) attending a public meeting;(v) attending a court hearing, meeting with an attorney or criminal justice personnel, or engaged in any activity ordered by a court;(vi) in the act of filing an appeal to an exclusion notice issued under this section;(vii) attending religious services or otherwise exercising a constitutional right.(b) A person shall not be issued an exclusion notice for prohibited camping or for otherwise sleeping within an exclusion zone.

(4) **Exclusion Notice.**  The Chief of Police is designated as the person in charge of civil exclusion zones for the purpose of issuing exclusion notices in accordance with this ordinance, and may authorize employees of the police department to issue exclusion notices. Written notice shall be given to any person excluded from a civil exclusion zone.  The notice shall specify the area from which the person is excluded, the length of exclusion, the offense(s) the person is accused of violating, and a description of the offending conduct.  Warnings of consequences

for failure to comply shall be prominently displayed on the notice. The notice shall inform the excluded person of the right to appeal to the municipal court, and shall include information on the time limit to file an appeal and place to deliver the appeal. Unless otherwise provided in the exclusion notice, the term of exclusion shall take effect upon issuance.

(5) **Appeal.** A person receiving an exclusion notice shall have the right to a hearing to have the exclusion rescinded, the period of exclusion reduced, or to request a variance. (a) The hearing request must be filed in writing to the Municipal Court Clerk at Medford City Hall within ten (10) days after receipt of the notice of exclusion. The hearing shall be conducted by the municipal court judge within ten (10) days of receipt of a request filed pursuant to this section; excluding Saturdays, Sundays, and holidays. (b) The hearing may be rescheduled for good cause shown, but shall be scheduled no later than five (5) additional business days from the rescheduled request. If an appeal is timely filed, the period of exclusion shall be stayed, pending the outcome of the appeal. If the exclusion is affirmed, the remaining period of exclusion shall be effective immediately upon issuance of the municipal court's decision.(c) The City shall have the burden of proving by a preponderance of the evidence the validity of the exclusion. If the municipal court finds by a preponderance of the evidence that the exclusion was based upon the conduct proscribed by subsection (2), and if the exclusion is otherwise in accordance with law, the municipal court shall uphold the exclusion. However, if the municipal court finds that the City has not met its burden of proof, or that the exclusion is otherwise unlawful, then the municipal court shall enter an order rescinding the exclusion. In the event that the municipal court finds that the City has met its burden of proof, but that the length or scope of the exclusion is unreasonable under the circumstances, the municipal court may issue an order shortening the length of exclusion or allowing for a variance. The decision of the municipal court is final.

(6) **Variance.** (a) The Court may in its discretion grant a variance to an excluded person at any time during the period of exclusion if the person:(i) presents a plausible need to engage in any non-criminal activity that is not associated with the behavior supporting the person's exclusion;(ii) establishes that he or she resides within an exclusion zone;(iii) presents a plausible need to obtain goods and services not otherwise available outside the exclusion zone to satisfy the person's essential needs.(b) The variance shall be in writing, for a specific period of time and only to accommodate a specific purpose, all of which shall be stated on the variance. The excluded person shall keep the variance document on his or her person at all times the person is within the exclusion area.

68.    The City of Medford Municipal Code 5.257, "Prohibited Camping, Lying, Sleeping" provides,

> **5.257 Prohibited Camping, Lying, Sleeping**
> (1)  As used in this section:
> (a)  "To camp" means to set up or to remain in or at a campsite.
> (b)  "Campsite" means any place where any stove or fire is placed, established or maintained for the purpose of maintaining a temporary place to live,  or where the use of any tent, lean-to, shack, or any other structure, or any vehicle or part thereof is placed, established or maintained for the purpose of maintaining a temporary place to live.
> (c)   "Bedding materials" means a sleeping bag, bedroll, or other material used for bedding purposes, including materials used to keep warm and dry while sleeping.
> (d)   "The Greenways" refers to the Bear Creek Greenway, the Larson Creek Greenway, the Lazy Creek Greenway, and the Navigator's Landing Greenway.
> (e)   "Vehicle camping in a lawful parking space" refers to a person experiencing homelessness parking utilizing a motor vehicle in a lawful parking space as a temporary place to live.  The vehicle must be operational and must be moved at least every 24 hours.  To fall within this definition, the parking space at issue cannot be adjacent to residences.
> (2)  It is found and declared that:
> (a)  From time to time persons establish campsites on sidewalks, public rights-of-way, under bridges, and so forth;
> (b)  Such persons, by such actions create unsafe and unsanitary living conditions which pose a threat to the peace, health, and safety of themselves and the community; and,
> (c)  During high and extreme fire conditions, the Greenways and Prescott Park pose a unique fire danger due to dry brush and abundant fuel sources;
> (d)  Enforcing existing arson laws and burning prohibitions on an incident-by-incident basis alone on the Greenways and Prescott Park during high and extreme fire conditions does not provide sufficient protection to public peace, health, and safety under such conditions, because of increased fire ignition potential and the rapid rate at which fire spreads under such circumstances;
> (e)  It is difficult for emergency personnel to evacuate individuals camping on the Greenways or Prescott Park during a fire event;
> (f) Wildfires on the Greenways and Prescott Park pose a severe threat to persons and property, including residents and property owners near those areas and persons  experiencing homelessness within those areas;
> (g)  Camping, lying, or sleeping on a playground or sports field

fundamentally undermines the public's ability to use that public property for its intended purpose;

(h) Camping, lying, or sleeping on or near railroad tracks, or in a manner that obstructs sidewalks prevents the public's ability to use that public property for its intended purpose and can in some situations result in imminent threats to life;

(i) This section's regulations are meant strictly to regulate the use of publicly-owned property, and are not intended to regulate activities on private property; and

(j) The enactment of this provision is necessary to protect the peace, health, and safety of the city and its inhabitants.

(3) No person shall place or utilize bedding materials upon any sidewalk, street, alley, lane, public right-of-way, park, greenway, or any other publicly-owned property or under any bridge or viaduct for more than 24 hours consecutively in a particular location, unless otherwise specifically authorized by this code, or by declaration of the Mayor in emergency circumstances, or by executive order of the City Manager pursuant to such declaration, or by declaration of the City Manager in the case of a severe event.

(4)    (a) Except as set forth in subsection (b), no person shall camp in or upon any sidewalk, street, alley, lane, public right-of-way, park, greenway, or any other publicly-owned property or under any bridge or viaduct.

    (b) The prohibition in subsection (a) does not apply to tent camping or vehicle camping in the following circumstances:

        (i) if otherwise specifically authorized by any provision of the Medford Municipal Code;

        (ii) by declaration of the Mayor in emergency circumstances, if so authorized by the declaration;

        (iii) by executive order of the City Manager pursuant to such declaration, if so authorized by the executive order;

        (iv) by declaration of the City Manager in the case of a severe event, if so authorized by                the declaration; or

        (v) if the City publishes on its website a written policy authorizing tent camping or vehicle camping on specific publicly-owned properties, then tent camping or vehicle camping on such properties is lawful and permissible consistent with the time, place, and manner constraints contained within any such written-and-published City policy.

(5) No person shall camp, lie, sleep, or use bedding materials in any of the following circumstances, unless otherwise specifically authorized by this code, by declaration of the Mayor in emergency circumstances, by executive order of the City Manager pursuant to such emergency declaration, or by executive order of the City Manager pursuant to such declaration, or by declaration of the City Manager in the case of a severe event:

(a) On the Greenways or Prescott Park, during the period May 1 to September 30 in any calendar year, or at any other time if the Fire Chief or the Fire Chief's designee determines that a fire hazard exists;

(b) On a playground or sports field during hours of closure. Notwithstanding Section 5.255, lying or sleeping in a City-owned park during hours of closure is not prohibited so long as the individual is experiencing homelessness, is not on a playground or sports field, is not on a "school park" associated with a school, and is not violating any other subsection of this section;

(c) On areas underneath roadways or bridges that are not open to the public;

(d) On railroad tracks or within fifteen feet of railroad tracks;

(e) On publicly-owned property not open to the public, including but not limited to the Public Works Service Center and park areas temporarily closed for construction, repairs, maintenance, cleaning and similar activities;

(f) On streets, including planter strips, medians and parking spaces;

(g) On sidewalks, if by doing so, the person obstructs pedestrian traffic along the sidewalk or into private property and businesses adjacent to the sidewalk. For purposes of this provision, an individual obstructs pedestrian traffic if that individual, by camping, lying, sleeping, or using bedding materials, reduces the path of travel to less than 36 inches.

(6 ) Prior to removing homeless individuals from an established camping site, law enforcement officials shall post a notice, written in English and Spanish, 24 hours in advance.

(a) At the time the notice is posted, law enforcement officials shall inform local agencies that deliver social services to homeless individuals that the notice has been posted. Any local agency, providing service within the City limits of Medford, desiring to be on this notification list must provide its name, address, telephone number, and name of contact person to the Medford Police Department, in writing, requesting notification.

(b) The local agencies may arrange for outreach workers to visit the camping site where a notice has been posted to assess the need for social service assistance in arranging shelter and other assistance.

(7) All unclaimed personal property shall be given to law enforcement officials whether 24-hour notice is required or not. The property shall be stored for 30 days during which it will be reasonably available to any individual claiming ownership. Any personal property that remains unclaimed for 30 days may be disposed of. For purposes of this paragraph, "personal property" means any item that is reasonably recognizable as belonging to a person and that has apparent utility. Items that have no apparent utility or are in an unsanitary condition may be immediately discarded upon removal of the homeless individuals from the camping site. Weapons, drug paraphernalia, and

CLASS ACTION COMPLAINT

items that appear to be either stolen or evidence of a crime shall be given to law enforcement officials.

(8)  The 24-hour notice required under subsection (4) of this section shall not apply:

(a)  When there are grounds for law enforcement officials to believe that illegal activities other than camping are occurring.

(b)  In the event of an exceptional emergency such as possible site contamination by hazardous materials or when there is immediate danger to human life or safety.

(c)  When the campsite is located in the areas specified in subsection 5(a) above, and the notice is placed during the time frame described in subsection 5(a) above, or when in the discretion of the Fire Chief or the Fire Chief's designee, the Greenways or Prescott Park should be immediately closed for fire danger as described in subsection 5(a) above or per Administrative Regulation 907.

(9)  A person authorized to issue a citation for unlawful camping may not issue the citation if the citation would be issued within 200 feet of the notice described in this section and within two hours before or after the notice was posted.

 (10) Violation of subsection (3) constitutes a violation.  Violation of subsection (4) consisting of vehicle camping in a lawful parking space constitutes a violation.  Every day in which such violations occur constitutes a separate violation.  A violation of subsection (4) or subsection (5) constitutes a crime, except for vehicle camping in a lawful parking space.

IV.                          <u>**Class Allegations**</u>

69.    Amber Macnab, Andre Bilodeau, Robert Bessy, Greg Killingsworth, Travis Greiner and

Rhonda Bjork bring this action on behalf of themselves and all others similarly situated

under Rule 23 of the Federal Rules of Civil Procedure. They seek to represent a class that

consists of all involuntarily homeless people living in Medford, Oregon.

70.    The Class is so numerous that joinder of its members is impracticable. The latest point-

in-time count for Jackson County indicates that the class numbers, at a minimum, in the

hundreds.  In addition to the hundreds of homeless adults, there are 2200 homeless youth

enrolledin school in Medford. Counsel has spoken to more than 100 unhoused members of the community in preparation for this case.

71.     The relief sought is common to all members of the proposed class, and common questions of law and fact exist as to all members of the class.  Plaintiffs seek prospective relief from enforcement of Medford anti-camping ordinances, Medford's Exclusion Zone, Medford's anti-sleeping ordinance and Criminal Trespass laws when they are enforced against members of the class solely because they have no place else to go.

72.     There is a well-defined community of interest in the questions of law and fact affecting the class as a whole. The questions of law and fact common to the class predominate over any questions affecting solely individual members of the action, and include:

    a.  Are emergency shelter beds available to all homeless individuals in Medford?

    b.  Are there other places where involuntarily homeless people can go in Medford?

    c.  Are resting, sleeping and sheltering oneself unavoidable basic human needs?

    d.  Does the City of Medford's enforcement of the anti-sleeping ordinance, the anti-camping ordinances and criminal trespass laws violate plaintiffs' rights to equal protection and due process under the Fourteenth Amendment to the UnitedStates Constitution?

    e.  Does the City of Medford's enforcement of the anti-sleeping ordinance, the anti-camping ordinances and criminal trespass laws violate plaintiffs' right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution? and

f.  Is prospective relief appropriate to stop the City of Medford from violating plaintiffs' rights?

g.  Is the City of Medford appropriately cataloguing and preserving the property of its unhoused members when it seizes their camps, arrests them or separates them from their belongings?

73.  Amber Macnab, Andre Bilodeau, Robert Bessy, Greg Killingsworth, Travis Greiner and Ronda Bjork's claims are typical to the class. Amber Macnab, Andre Bilodeau, Robert Bessy, Greg Killingsworth, Travis Greiner, Ronda Bjork and the proposed class are homeless individuals who have been and are subject to the enforcement of the City's anti- camping ordinances, anti-sleeping ordinance, the exclusion zone and criminal trespass laws as well as the City's other policies and practices aimed at making homeless people in Medford uncomfortable and driving them out of town.

74.  Amber Macnab, Andre Bilodeau, Robert Bessy, Greg Killingsworth, Travis Greiner and Ronda Bjork will fairly and adequately protect the interests of the class. Counsel and associates have been walking the Greenway collecting declarations from other members of the class and speaking with the unhoused. Some of those declarations are attached for the Court.

75.   A class action is the appropriate and superior method for the fair and efficient adjudication of this controversy. Prosecuting separate actions would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the City of Medford. Allowing this lawsuit to proceed as a class action will permit the class of similarly situated persons to prosecute their common claims in a single forum

simultaneously and efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would entail.

76.    To the extent that any member of the class could afford individual litigation, it would be unduly burdensome to the judicial system. Concentrating this litigation in one forum will promote judicial economy, consistency, and parity among the claims of individual members of the class.

77.    Plaintiffs know of no difficulty which would be encountered in the management of this litigation that would preclude its maintenance as a class action.

### V. <u>Plaintiffs Attempted to Resolve this Matter Prior to Litigation</u>

78.    Plaintiffs' counsel contacted the City of Medford on May 6, 2021 to demand relief as outlined in this complaint.

79.    Plaintiff's notified of their intent to sue on numerous occasions prior to the ratification of the new Medford Anti-Camping Ban.

80.    Despite these efforts, the parties have not been able to resolve their dispute.

### FIRST CLAIM FOR RELIEF
### Eighth Amendment to the U.S. Constitution
### (Cruel and Unusual Punishment)
### and 42 U.S.C. § 1983

81.    Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

82.    Unsheltered homeless people in Medford are involuntarily homeless in public. They have no place to go.

83.    Resting, sleeping and seeking shelter is not voluntary conduct. They are basic and harmless human needs. Performing these acts in public is integral to the status of being unhoused in Medford.

84.    By punishing the acts of resting, sleeping or seeking shelter in public, without providing any legal place for most homeless place to conduct such activities, Medford effectively punishes the status of homelessness.

85.    By subjecting the unhoused to unlawful Search and Seizure in order to secure temporary low-barrier shelter, Medford punishes the status of homelessness.

86.    By requiring a curfew in order to secure a low-barrier shelter, Medford punishes the status of homelessness. By requiring most unhoused members of our community to get referred by law enforcement to get into any possible low-barrier shelter, the City places unhoused people in the untenable situation of having to approach a team of people that have arrested, cited, detained, derided and moved them along for their entire unhoused existence.

87.    As applied to the homeless individuals, the City's enforcement of the anti-sleeping ordinance, the anti-camping ordinances, the exclusion zone, the theft of services statutes and criminal trespass laws violates the 8th Amendment proscription of cruel and unusual punishment by harming plaintiffs with sanctions for engaging in innocent, involuntary, life-sustaining activity, thus effectively criminalizing their homeless status.

88.    In the absence of prospective injunctive relief, plaintiffs and prospective class members will be subject to the real threat of being ticketed, arrested, fined and jailed in violation of theirright against cruel and unusual punishment.

89.    Plaintiffs are entitled to injunctive and declaratory relief, as set forth below.

90.     Plaintiffs are entitled to their reasonable costs and attorney fees on this claim pursuant to

        42 U.S.C. § 1988.

91.     The class reserves the right to supplement and amend the complaint as investigation

        continues.

**SECOND CLAIM FOR RELIEF:**
**Fourteenth Amendment to the U.S. Constitution**
**(Equal Protection)**
**and 42 U.S.C. § 1983**

92.      Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

93.     Defendants selectively enforce the anti-sleeping ordinance, the exclusion zone ordinance,

        the anti-camping ordinancesand criminal trespass laws against individuals like Amber

        Macnab, Andre Bilodeau, Robert Bessy, Greg Killingsworth, Travis Greiner and Ronda

        Bjork pursuant to a discriminatory purpose to rid the City of Medford of homeless

        individuals.

94.     Amber Macnab, Andre Bilodeau, Robert Bessy, Greg Killingsworth, Travis Greiner and

        Ronda Bjork and the class they seek to represent have been told by Medford police that

        there is no place where homeless people are allowed to have tents or sleep freely outdoors

        with any shelter over their heads in Medford. The fundamental right of the plaintiffs to

        move about freely and engage in harmless life-sustaining activities such as resting,

        sleeping and attempting to stay warm was and is infringed on by Defendant's conduct and

        enforcement of the camping ordinances, the sleeping ordinance and criminal trespass laws.

95.   Homelessness is an arbitrary classification that Defendant uses to accomplish the forbidden aim of ridding the City of Medford of homeless persons through selective application of the above laws.

96.   Non-homeless people are not ticketed, fined, prosecuted and jailed for resting or sleeping or camping in public.

97.   Defendant's selective enforcement of these laws violates the Equal Protection clause of the 14th Amendment of the U.S. Constitution.

98.    Plaintiffs are entitled to injunctive and declaratory relief, as set forth below.

99.   Plaintiffs are entitled to their reasonable costs and attorney fees on this claim pursuant to 42 U.S.C. § 1988.

100.   The class reserves the right to supplement and amend the complaint as investigation continues.


### THIRD CLAIM FOR RELIEF:
### Fourteenth Amendment to the U.S. Constitution (Substantive Due Process)
### and 42 U.S.C. § 1983

101.    Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

102.   The fundamental right of the individual plaintiffs to move about freely and engage in harmless life-sustaining activities such as resting, sleeping and attempting to stay warm was andis infringed on by Defendant's conduct and enforcement of the camping ordinances, the sleeping ordinance and criminal trespass laws.

103.   Defendant's conduct violates the Due Process clause of the 14th Amendment to the U.S. Constitution.

104.    Plaintiffs are entitled to injunctive and declaratory relief, as set forth below.

105.    Plaintiffs are entitled to their reasonable costs and attorney fees on this claim pursuant to 42 U.S.C. § 1988.

106.    Plaintiffs incorporate by reference the allegations above as if fully set forth herein.


## FOURTH CLAIM FOR RELIEF:
## Fourteenth Amendment to the U.S. Constitution (Procedural Due Process/Notice) and 42 U.S.C. § 1983

107**.**    Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

108.    The City of Medford's anti-camping ordinances do not provide constitutionally sufficient notice such that a reasonable homeless person in Medford would understand what conduct is prohibited.

109.    Plaintiffs have not been given meaningful notice prior to being deprived of the liberty interests in moving freely through Medford, resting, sleeping and seeking shelter from the elements.

110.    Plaintiffs are entitled to their reasonable costs and attorney fees on this claim pursuant to 42 U.S.C. § 1988.

111.    Plaintiffs incorporate by reference the allegations above as if fully set forth herein.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask the Court for the following relief:

112.    To certify the class as defined above at ¶ 42;

113.    To declare Medford's campaign to drive homeless people out of the City

unconstitutional and enjoin such practices, policies and customs;

114.    To issue a declaration that, as applied to plaintiffs, enforcement of MMC 5.256 (the

"civil" exclusion zone), MMC 5.257 (the anti-sleeping and camping ordinance), the theft

of services laws  and criminal trespass laws is an unconstitutional infringement on

plaintiffs' Eighth and Fourteenth Amendment rights.

115.    To issue an injunction prohibiting Medford from enforcement of MMC 5.256 (the "civil"

exclusion zone), MMC 5.257 (the anti-sleeping and camping ordinance), the theft of

services laws  and criminal trespass laws against homeless individuals in Medford who

are engaged in the life sustaining activities of resting, sleeping or seeking shelter from the

elements, unless and until Medford provides a place where plaintiffs can lawfully engage

in necessary life-sustaining activities.

116.    To award Plaintiffs their costs and attorney fees, pursuant to 42 U.S.C. § 1988

117.     To award Plaintiffs such other relief as may be just and equitable.


 Respectfully submitted, this 23rd  day of October , 2022.

                                        /s/ Justin N. Rosas
                                        Justin N. Rosas
                                         Attorney for Plaintiffs