IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVSION

ANDRE BILODEAU, ROBERT BESSY,
AMBER MCNAB, GREG
KILLINGSWORTH, TRAVIS GREINER,
and RONDA BJORK,

               Plaintiffs,

                  v.

CITY OF MEDFORD,

               Defendant.

Case No. 1:21-cv-00766-CL

**FINDINGS AND
RECCOMENDATION**

---

**CLARKE**, Magistrate Judge

       Plaintiffs Andre Bilodeau, Robert Bessy, Amber McNab, Greg Killingsworth, Travis

Greiner, and Ronda Bjork seek declaratory and injunctive relief against Defendant City of

Medford. Before the Court is the City's Motion for Summary Judgment. ECF No. 51. The Court

held an oral argument on November 21, 2023. The Court also considered an amicus brief filed by

League of Oregon Cities in support of the City's Motion. For the reasons below, the Court

recommends the Motion for Summary Judgment be GRANTED.

## LEGAL STANDARD

       Summary judgment shall be granted when the record shows that there is no genuine

dispute as to any material fact, and that the moving party is entitled to judgment as a matter of

law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The

moving party has the initial burden of showing that no genuine issue of fact exists. *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323 (1986); *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)

(*en banc*). The court cannot weigh the evidence or determine the truth; it may only determine

whether there is a genuine issue of fact. *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th

Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable jury could return

a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When a properly supported motion for summary judgment is made, the burden shifts to

the opposing party to set forth specific facts showing that there is a genuine issue for trial. *Id.* at

250. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion

for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the

opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts

which show there is a genuine issue for trial. *Devereaux*, 263 F.3d at 1076. In assessing whether

a party has met its burden, the court views the evidence in the light most favorable to the non-

moving party. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).

## FACTUAL BACKGROUND

This case is brought against a backdrop of unprecedented growth in Oregon's homeless

population. On January 10, 2023, Oregon's Governor, Tina Kotek, issued an Executive Order

declaring a state of emergency due to homelessness. Exec. Order No. 23-02 (Jan. 10, 2023),

https://www.oregon.gov/gov/eo/eo-23-02.pdf. Oregon's homeless population has increased by

63% over the past six years, placing Oregon nationally as having the fourth-highest rate of

unsheltered homelessness and the highest rate of unsheltered homelessness for families with

children. *Id.*; *see also* Amicus Brief, ECF No. 70.

Jackson County, where the City of Medford sits, has experienced a 132% increase in its

unsheltered homeless population. Oregon cities, more than ever before, are revising their policies

and practices to accommodate the increasing size of their homeless populations, while balancing their obligation to provide safe and livable communities. Medford is the largest city in southern Oregon, and home to a significant homeless community. The City has spent years attempting to address its housing crisis through a broad range of interventions aimed at structural, financial, and policy changes.

In terms of shelters, the City works collaboratively with local groups to offer a few different housing options. In 2016, the City authorized the construction of Hope Village, a tiny-house transitional housing campground. Mitton Decl., ECF No. 53 at ¶ 2; *see also* Ex. 1. Hope Village is run by a non-profit called Rogue Retreat on city-owned property leased through an effective subsidy for $1 per year. *Id.* In 2020, the City and Rogue Retreat created another housing option called the Urban Campground, a low-barrier tent camping area. *Id.* at ¶ 3. The City allocated $1,000,000 of funds for the acquisition of a permanent site for the Urban Campground after roughly one year of operating. *Id.*; *see also* Ex. 2. The receipt of the funds included the following program description:

> The City of Medford shall find and purchase land to set up a permanent Urban Campground to house the homeless living in places unfit or unintended for human habitation. The permanent campground will include adequate spaces to allow social distancing, hand washing stations, adequate restrooms and basic needs such as electricity and running water.

*Id.* at Ex. 2. Thirty hard-shell duplex units were recently approved to be installed at the Urban Campground and expand current capacity. *Id.* at ¶ 3. The City also purchased two properties for use as the "Navigation Center," a facility intended to offer wraparound services. *Id.* at ¶ 4. The Center houses the Kelly Shelter as well, another low-barrier shelter operated by Rogue Retreat and financially supported by the City. *Id.* at ¶ 5.

In addition to year-round shelters, the City has incorporated mechanisms that allow for flexible modification in the event that increased shelter is needed because of uninhabitable weather. Medford's Land Development Code has included a Severe Event Shelter provision in order to provide short-term relief from extreme weather since 2019. *Id.* at Ex. 8 (MMC 10.825). During the summer of 2021, the City repurposed the Medford Senior Center to use as a cooling shelter. *Id.* at ¶ 8. The following winter, the City partnered with ACCESS to provide a Severe Weather Shelter in a city-owned building. *Id.* When that building was repurposed for the Navigation Center, the Severe Weather Shelter was moved to another location, supported in part by $142,975 of City funding awarded on May 4, 2023. *Id.*; *see also* Ex. 9 at 2. Presently at issue, Medford Municipal Code 5.257(4)(b)(iv) allows loosening or lifting restrictions on structure camping during cold weather. *Id.* at ¶ 14.

Shelter beds are nonetheless outnumbered by homeless individuals in Medford. The City relies on a section of its police force, the Livability Team, to monitor and coordinate use of its limited shelters. The Livability Team is intended to close existing gaps in resources by monitoring camps, enforcing ordinances, facilitating services, and issuing referrals. *Id.* at ¶ 6; *see also* Kirkpatrick Decl., ECF No. 54. The Team publishes reports that reflect, among other things, the spaces available across shelters. Mitton Decl., ECF No. 53 at. ¶ 6; *see also* Exs. 4-7. Although susceptible to constant fluctuations, these reports appear to regularly reflect availabilities at shelters and success through the referral program. *Id.*

In terms of direct financial support, the City has provided funding to a variety of organizations focused on alleviating involuntary homelessness. The City estimates it spent $19.5 million to support homeless services over the course of three years. *Id.* at ¶ 16. In addition to those already named, Resolution 2022-16 provides grant funding to shelters and homeless

services including Hearts with a Mission's youth emergency shelter, Community Works' Dunn House Shelter, and Transitional Housing for Homeless Youth and Youth with Children. *Id.* at ¶ 5; Ex. 3. Resolution 2023-53 awarded $413,000 to the Oasis Center to provide emergency shelter for 30 pregnant women experiencing homelessness and recovering from addiction. *Id.* at ¶ 9; Ex. 9. Ordinance 2021-134 approved funding for Project Turnkey, an on-going plan to convert a motel into shelter and transitional housing for fire victims, unhoused community members, and unhoused patients following their discharge from the hospital. *Id.* at ¶ 10; Ex. 10, 17.

As to other creative, long-term policy supports, the City added two seats to its Community Services and Development Commission that are explicitly reserved for members who have experienced or are currently experiencing homelessness. *Id.* at ¶ 11; Ex. 11. The City also established the Affordable Housing Construction Excise Tax which taxes market-rate development to subsidize affordable housing development through the Housing Opportunity Fund. *Id.* at ¶ 17; MMC 9.280. The City testified in support of House Bill 2916 as well, which lifted the State of Oregon's restriction on how many parcels could be designated as transitional housing campgrounds within a municipality. *Id.* at Ex. 12.

House Bill 3115 was also passed with the City's support. *Id.* at Ex. 13. Oregon's legislature enacted House Bill 3115 in 2021 intending to capture and codify the key principles of *Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019) and *Blake v. City of Grants Pass*, No. 1:18-CV-01823-CL, 2020 WL 4209227 (D. Or. July 22, 2020).[1] *See* H.B. 3115, 81st Leg. Assemb., Reg. Sess. (Or. 2021). The Bill directed Oregon cities to update any laws regulating the acts of sitting, lying, sleeping, or keeping warm and dry on public property to be objectively reasonable as to time, place, and manner, with regards to persons experiencing homelessness. *Id.* The City

---

[1] *Blake* became *Johnson v. City of Grants Pass*, 72 F.4th 868 (9th Cir. 2023) on appeal. Unless citing to the Ninth Circuit opinion specifically, *Johnson* will be referred to as "*Blake*" for consistency.

of Medford joined other Oregon cities in revising their public camping and sleeping restrictions, consistent with this directive. In place of total sleeping bans, Oregon cities have altered their laws to allow reasonable times, places, and manners in which homeless residents may humanly rest and sleep in public outdoor settings. Some cities have limited the manner of camping permitted (i.e., prohibiting unleashed animals, open fires, alteration of soil, or specific types of waste disposal), while others have limited locations (such as not allowing camping near schools, highways, construction sites, and wildlife habitats). *See* Amicus Brief, ECF No. 70.

The City claims its camping ordinance, Medford Municipal Code 5.257 Prohibited Camping, Lying, and Sleeping, was implemented in direct response to the case law and House Bill 3115. Def. MSJ, ECF No. 51 at 6. In order to comply with the mandates of *Martin* and strike the balance identified as necessary in *Blake*, the City sought feedback from the public on a draft of the ordinance that permitted sleeping in specific areas, which underwent rounds of edits driven by the contributions of the stakeholders and the public, as well as local groups—the Housing Advisory Commission, the Community Services and Development Commission, the Homeless Task Force, and local activists. *See* Mitton Decl. ECF No. 53, Ex. 21. The final version was adopted in April 2021 in the form provided below in the Appendix. According to the City, the Camping Ordinance is distinguishable for its level of community input and its "resources first, enforcement last" style of approach. Def. MSJ, ECF No. 51 at 17. Once the Livability Team posts a 72-hour unlawful establishment note, service providers are brought in to engage individuals around the area. Kirkpatrick Decl. ECF No. 54. Reports reflect moderate success, showing an increase in referrals to shelters. Mitton Decl., ECF No. 53, Ex. 25. Nonetheless, such notices still frequently result in the police discarding the belongings of the

space's previous inhabitants. Antley Decl., ECF No. 55.; *see generally* Pls. Resp., ECF No. 67, Ex. 7, 8 (Plaintiffs' declarations).

Plaintiffs in this case are six homeless or unhoused residents of Medford who have been feeling the practical effects of the City's ordinances for some time. First Am. Comp., ECF No. 40 at ¶ 10 ("FAC").

Travis Greiner has been involuntarily homeless for at least five years. Pls. Resp., ECF No. 67, Ex. 7 at ¶¶ 1-2. He claims he has been cited, arrested, and jailed for prohibited camping multiple times in the last year, and that on those occasions his possessions were disrupted and lost. *Id.* at ¶¶ 8, 11, 14. Mr. Greiner evinces a general distrust for officers and emphasizes the impracticability of packing up and transporting his home every few days. *Id.* at ¶¶ 5-6. He claims he is not eligible for any Rogue Retreat beds and refuses to comply with shelters that enforce curfews and possible searches. *Id.* at ¶¶ 3-4.

Ronda Bjork has been involuntarily homeless for at least five years as well and is presently a new mother. Pls. Resp., ECF No. 67, Ex. 8 at ¶ 2, 5. She has been cited and arrested for prohibited camping but does not feel comfortable approaching officers to receive services for fear of being searched, subjected to curfews, or possibly opening the door to future charges. *Id.* at ¶ 16. Ms. Bjork explains that living outside subjects her and her child to the elements, possible exposure, and likely theft, but nonetheless, she does not feel that shelters are a viable option for her. *Id.* at ¶¶ 6-7.

The Court has not received any supporting affidavits or declarations of the remaining four Plaintiffs. However, the FAC provides some illustration of their lives. Robert Bessy has been involuntarily homeless for two years after losing his job and housing. FAC, ECF No. 40 at ¶ 24. He echoes Ms. Bjork and Mr. Greiner's protests about being frequently uprooted. For Mr.

Bessy, the fear of leaving his home unattended, coupled with complications from citations, have precluded him from maintaining employment. *Id.* at ¶¶ 25-27. Greg Killingsworth has been homeless for nine years and claims there is no shelter available to him. *Id.* at ¶ 29. He has been subjected to multiple sweeps in which he lost many of his basic necessities and all remaining mementos with familial or historic value. *Id.* at ¶ 30. Amber McNab has been homeless for ten years and claims there are no shelters available to her. *Id.* at ¶ 32. She has been displaced, harassed, and cited many times throughout her time unhoused. *Id.* at ¶¶ 33-35. Andre Bilodeau has been homeless intermittently for three years. Like the others, he recounts being forcibly moved, having his belongings destroyed, and facing an inability to avoid trespass and seek shelters. *Id.* at ¶¶ 43-49.

Plaintiffs allege that despite Medford's efforts, the City maintains a web of ordinances, customs, polices, and practices that unconstitutionally criminalize the existence of homeless people in Medford by punishing involuntary human acts.

## PROCEDURAL BACKGROUND

Plaintiffs filed this lawsuit on May 18, 2021, seeking declaratory and injunctive relief from the enforcement of Medford Municipal Codes 5.256 Civil Exclusion ("Exclusion Ordinance") and 5.257 Prohibited Camping, Lying, and Sleeping ("Camping Ordinance"), as well as other theft of services laws and criminal trespass laws. FAC, ECF No. 40. The full Exclusion Ordinance is also provided in the Appendix.

Plaintiffs previously moved to certify a class of all involuntary homeless people in Medford. Pls. Mot., ECF No. 21. The Court denied class certification, finding that Plaintiffs had not submitted material sufficient for the Court to form a reasonable judgment. *See* F. & R., ECF No. 44 at 6, 9, 13, 14, 19 (adopted and denying certification in ECF No. 49). There were no

supporting documents filed with the motion to certify until Plaintiffs' 237-page reply was submitted, which included four declarations and ten exhibits that were rarely cited to or explained for their usefulness. *See* Pls. Reply, ECF No. 28.

Now before the Court is the City's Motion for Summary Judgment and it suffers from the same lack of support. Plaintiffs' 851-page Response includes nine exhibits: (1) a transcript of a Jackson County Municipal Court proceeding, (2) House Bill 2367, (3) a letter written in support of House Bill 2367, (4) the City's biennial budget, (5) ABA Standards for Criminal Justice Providing Defense Services, affidavits from (6) Plaintiffs' counsel, (7) Mr. Greiner, and (8) Ms. Bjork, and (9) a dismissal order from a Jackson County Municipal Court. Pls. Resp., ECF No. 67. Without page numbers, the scant citations found in the Response Brief are inappropriately cumbersome and generally fail to explain how each exhibit supports Plaintiffs' constitutional claims directly. For example, Exhibits 5 and 6 are relied upon solely to show the workload and pay of a public defender. *See* Pls. Resp., ECF No. 67 at 4, 19. Exhibit 4 is a 554-page budget report that Plaintiffs cite, without page numbers, ostensibly to show how much the City spent on law enforcement. *Id.* at 13. Exhibit 1 is a 114-page transcript that Plaintiffs cite, again without page numbers, to puzzlingly challenge the City's exclusion zone hearings. *Id.* at 17.

## ISSUE

The City moves for summary judgment in its favor on all claims brought by Plaintiffs: a cruel and unusual punishment claim under the Eighth Amendment, an equal protection claim under the Fourteenth Amendment, a substantive due process claim under the Fourteenth Amendment, and a procedural due process claim under the Fourteenth Amendment. The City argues that Plaintiffs lack standing to bring injunctive relief claims because they cannot establish

unavoidable exposure to citation under the ordinances. In the alternative, the City argues that Plaintiffs' claims each fail for individual deficits. The Court agrees.

## DISCUSSION

The Court recommends summary judgment be granted on any residual claims as a preliminary matter. The FAC cites only to the Exclusion Ordinance and the Camping Ordinance, yet "theft of services laws and criminal trespass laws" are also intermittently referenced. *See* FAC, ECF No. 40 at ¶ 115. Plaintiffs have not clarified to which laws they refer and have not otherwise revisited them by way of citation, exhibit, or reference in argument.[2] To the extent claims against the "theft of services laws and criminal trespass laws" still exist, the Court recommends summary judgment be granted as to those claims for lack of support.

As to the Exclusion Ordinance and the Camping Ordinance, the Court recommends summary judgment be granted in the City's favor for the following reasons.

## I.    Standing

Before proceeding to the merits, federal courts must determine that they have jurisdiction. *Lance v. Coffman*, 549 U.S. 437, 439 (2007). Jurisdiction exists only where standing has been established. *Id.* To have standing, a plaintiff must show an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)).

Imminence is "a somewhat elastic concept" but should not be stretched to include injuries that are overly speculative or uncertain. *Martin*, 920 F.3d at 609 (quoting *Clapper*, 568 U.S. at 409). A plaintiff, however, need not await an arrest or prosecution to establish standing. *Id.*

---

[2] This ambiguity was previously highlighted for the parties in this Court's Findings and Recommendation, and Plaintiffs have not clarified their claims in the interim. *See* F. & R., ECF No. 44 at FN 1.

"When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). A motion for summary judgment premised on a lack of standing may be defeated by showing some genuine dispute of material fact as to the elements of standing; a plaintiff need not establish they in fact have standing. *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002).

The City argues Plaintiffs lack standing because they cannot establish unavoidable exposure to citation under the Camping Ordinance: because the Ordinance does not prohibit all forms of sleeping on any public property, Plaintiffs cannot show their injury is imminent. Plaintiffs respond by reasoning that their chronic history of being homeless is a sufficient basis to conclude that Plaintiffs will continue to be homeless and continue to face a threat of prosecution under the Ordinance. In this case, the question of standing largely comes down to an evidentiary issue. The current summary judgment record contains affidavits from only two of the Plaintiffs, Mr. Greiner and Ms. Bjork. There has been no evidence submitted on behalf of Mr. Bilodeau, Mr. Bessy, Ms. McNab, or Mr. Killingsworth beyond the bare allegations provided in the FAC and repeated in the motion to certify. Without declarations, affidavits, or any other actual evidence, the remaining Plaintiffs' allegations lack the requisite support that is demanded by a motion for summary judgment. The Court is accordingly unable to conclude that a genuine dispute exists as to the standing of these four Plaintiffs.

Mr. Greiner and Ms. Bjork make a slightly stronger showing. *See* ECF No. 67, Exs. 8, 9. In their affidavits, each alleges a general intention to continue camping in tents, with a reluctance

to move their belongings. They also claim that they are not eligible for beds offered by the

Rogue Retreat and otherwise refuse to avail themselves of shelters in the area. Taking those

allegations as true, it is reasonably probable in the future that Mr. Greiner and Ms. Bjork will

continue to live outside in tents, implicating the prohibitions of the Camping Ordinance and

thereby, posing a credible risk of prosecution.

The Court therefore finds that only Mr. Greiner and Ms. Bjork have demonstrated a

dispute of fact as to their standing to challenge the Ordinances. Summary judgment should be

granted in the City's favor as to the remaining Plaintiffs finding that they have failed to set forth

specific facts, beyond conclusory allegations, to show there is a dispute for trial.

Having found at least some dispute of fact as to standing, the Court moves to the

substance of Plaintiffs' claims and recommends granting summary judgment in the City's favor

with respect to each claim.

## II.    Eighth Amendment

The Eighth Amendment exists to limit the government's power to punish. *Austin v.*

*United States*, 509 U.S. 602, 609 (1993). Where cities wield their power in a way that punishes

involuntary human acts, courts in the Ninth Circuit have invoked the Eighth Amendment to find

such practices, policies, and ordinances unconstitutional.

In *Martin*, the plaintiffs faced ordinances that criminalized camping in any public space

at any time, whether bare or with basic bedding. *Martin*, 920 F.3d at 617-18. The ordinances

were enforced without regard for the lack of space available at shelters, of which there were only

three, each privately-run and religiously affiliated. *Id.* at 604-5. The Ninth Circuit struck down

the ordinances, holding that the Eight Amendment's prohibition on cruel and unusual

punishment bars a city from criminally prosecuting people for involuntarily sitting, lying, and sleeping in public when no alternative shelter is available to them. *Martin,* 920 F.3d at 617.

In *Blake,* the plaintiffs faced an ordinance that prohibited any camping, defined to include simply sleeping with bedding, in any public spaces at all times. *Blake,* 2020 WL 4209227 at *6. Camping in cars and sleeping on sidewalks were also prohibited. *Id.* Despite not having any shelters that met the United States Department of Housing and Urban Development criteria, the city officials pursued measures to aggressively cure its "vagrancy problems." *Id.* at *3. Applying *Martin,* this Court held that in light of the city's lack of adequate shelter, its practice of punishing the act of sleeping outside with a blanket to stay warm constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Id.* at *8. The Ninth Circuit partially affirmed this Court's narrow decision, reaching slightly beyond *Martin* to hold "that 'sleeping' in the context of *Martin* includes sleeping with rudimentary forms of protection from the elements, and that *Martin* applies to civil citations where, as here, the civil and criminal punishments are closely intertwined." *Johnson v. City of Grants Pass,* 72 F.4th 868, 896 (9th Cir. 2023).

Neither *Martin* nor *Blake* dictates to local governments that they must provide commensurate shelter or strike down all restrictions:

> The City may implement time and place restrictions for when homeless individuals may use their belongings to keep warm and dry and when they must have their belongings packed up. The City may also implement an anti-camping ordinance that is more specific than the one in place now. For example, the City may ban the use of tents in public parks without going so far as to ban people from using any bedding type materials to keep warm and dry while they sleep. The City may also consider limiting the amount of bedding type materials allowed per individual in public places. Moreover, this holding does not limit Grants Pass' ability to enforce laws that actually further public health and safety, such as laws restricting littering, public urination or defecation, obstruction of roadways, possession or distribution of illicit substances, harassment, or violence.

*Blake*, 2020 WL 4209227 at \*15. *Blake* rests on the notion that cities have a dual obligation: they are charged with protecting the safety and welfare of their citizens, as well as respecting the dignity of their homeless residents. *See id.* at \*1. This balancing act permits cities to reasonably restrict the freedoms of homeless individuals in public settings, provided those restrictions serve the interests of safety and the general welfare. If, however, such restrictions coalesce to prevent any practical opportunities for resting or sleeping, or are otherwise passed pretextually with the concealed intention of disappearing homeless residents, such restrictions cannot be deemed reasonable.[3]

Plaintiffs here claim that the City's enforcement of the Camping Ordinance unconstitutionally punishes involuntary human acts: "By punishing the acts of resting, sleeping or seeking shelter in public, without providing any legal place for most homeless place [sic] to conduct such activities, Medford effectively punishes the status of homelessness." FAC, ECF No. 40 at ¶ 84.

Plaintiffs' argument fails to acknowledge the dispositively different facts presented by the circumstances of Medford, as contrasted by those in *Blake* and *Martin*. First, Plaintiffs here do not face a city-wide ban on sleeping or camping. Unlike the ordinances involved in *Martin* and *Blake*, the Camping Ordinance does not unconditionally punish the acts of resting, sleeping, or seeking shelter. Sleeping or lying (defined to allow the use of sleeping bags, bedrolls, and other bedding materials to keep warm and dry) is permitted generally in parks, even after

---

[3] An ordinance allowing rest in public areas only during daytime hours is not a reasonable time, place, and manner restriction nor compliant with *Martin*: "The Court will not countenance that city may constitutionally criminalize sleeping outside during the evenings so long as it provides some public space that is available during daytime hours. *Martin* cannot and does not stand for such a proportion." *Wills v. City of Monterey*, 617 F. Supp 3d 1107, 1120-21 (N.D. Ca. 2022); *see also Langley v. City of San Luis Obispo*, No. CV2107479CJCADSX, 2022 WL 18585987, \*4 (C.D. Cal. Feb. 7, 2022) (rejecting similar daytime restrictions).

closure, and on sidewalks, provided 36-inches remains clear for passage. *See* MMC 5.257(5). There are some prohibited zones in specific greenways and parks during fire season, but the City properly balanced those restrictions in consideration of the unique fire danger presented by having excess materials in a region that has annually been devastated by wildfire. *See* MMC 5.257(2). Camping is subject to different restrictions. Camping (defined as structure camping or using a fire) is generally prohibited on publicly owned property. *See* MMC 5.257(4). Exceptions can arise for approved tent or car camping through a variety of means, such as the Urban Campground, through the authorization of nonprofits, and during extreme weather events. *Id.* Notably though, camping does not include merely sleeping with bedding. Thus, not only is there no city-wide ban on camping and sleeping, but there is also no prohibition of the use of blankets or bedding materials to stay warm and dry in approved areas. The circumstances at play in the City of Medford are determinatively different from past cases in that they preserve times, places, and manners in which homeless residents may humanely rest.

Plaintiffs highlight for the Court that there are many times throughout the year when merely a blanket is insufficient to keep one warm and dry. Rather, Plaintiffs contend, tents are a necessary piece of equipment for sleeping outdoors because they provide greater coverage from the elements and protection from insects and wildlife. Plaintiffs make an indisputable point; tents provide more security and more shelter than blankets and bedding. Their argument is better presented to local governments and policy makers. The Court's duty is only to assess the City's ordinances to determine if they pass constitutional muster. And under the current precedent, there is no constitutional right to a tent. Being that the City allows its unhoused residents to reasonably sleep with bedding to keep warm and dry in designated public areas around Medford, the Court finds the Camping Ordinance reasonable.

Plaintiffs' situation differs from precedent in another critical way: shelters. Unlike *Martin* and *Blake*, there is a range of publicly funded, low-barrier shelters in Medford, some of which offer collaborative public services. There are options for tent camping at the Urban Campground, tiny houses at Hope Village, low-barrier shelters with wraparound services at the Navigation Center, and additional, albeit more restrictive shelters that are privately run around the area. Hard-shell duplexes, a stable site for the Urban Campground, future affordable housing, and building restoration projects have also been planned, approved, and funded.[4]

The Constitution does not demand that a city provide a bed for each homeless resident. Consequently, the presence of shelters is not dispositive to the issue. Courts do, however, assess the landscape of shelters available in a city as a condition precedent to sleeping bans and as a factor where the evidence demonstrates egregious or discriminatory enforcement of policies. Where a city has participated in making multiple shelters available, it reflects a commitment to assisting their unhoused neighbors, and it lends itself to the reasonability of whatever restrictions are in place. Here, the number of resolutions recently adopted by the City shows a commitment to the issue by not only the City, but members of the community who have offered their input. The Court finds little utility in rebuking those efforts, particularly where many of the seeds have been recently planted and require time and dedication before their adequacy can be measured.

---

[4] Plaintiffs argue that shelters run by the Rogue Retreat should not be considered in the City's favor. They allege that the Rogue Retreat unconstitutionally imposes curfews and subjects residents to unreasonable searches and seizures: "[I]t is also cruel and unusual to force people into a choice between waiving their right to be free from searches by law enforcement and its agents absent probable cause or being arrested for sleeping outside. It is also cruel and unusual to force citizens to submit to a law enforcement curfew in order to not be arrested for sleeping outside." Pls. Resp., ECF No 67 at 6. In making this claim, Plaintiffs assert that strict scrutiny should apply to the alleged curfew and search policies because courts have applied a heightened standard to curfews and searches in the past. Plaintiffs, however, cite only to distinguishable cases that have nothing to do with homeless shelters run by third parties. Plaintiffs have also failed to offer proof that any such policy is enforced by Rogue Retreat. Without a fully formed and supported argument, the Court can neither understand nor make a recommendation on this claim.

For the forgoing reasons, the Court finds the City's Ordinance to be constitutional. The City is entitled to judgment as a matter of law on Plaintiffs' Eighth Amendment claim.

## III.    Equal Protection

The Equal Protection Clause guarantees that "all persons similarly circumstanced shall be treated alike." *Plyler v. Doe*, 457 U.S. 202, 216 (1982). There are a few methods by which a plaintiff may allege an equal protection violation.

A plaintiff may allege the defendant acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class. However, "[w]here the governmental classification does not involve a suspect or protected class or impinge upon a fundamental right, the classification will not 'run afoul of the Equal Protection Clause if there is a rational relationship between disparity of treatment and some legitimate governmental purpose.'" *E.g.*, *Nails v. Haid*, No. SACV 12-0439 GW SS, 2013 WL 5230689, at *3 (C.D. Cal. Sept. 17, 2013) (quoting *Nurre v. Whitehead*, 580 F.3d 1067, 1098 (9th Cir.2009)). Thus, absent a suspect class, protected class, or fundamental right, rational basis review applies.

A plaintiff may also allege selective enforcement of the ordinance at issue. To show selective enforcement, a plaintiff "must demonstrate that enforcement had a discriminatory effect and the police were motivated by a discriminatory purpose." *Rosenbaum v. City and County of San Francisco*, 484 F.3d 1142, 1152 (9th Cir. 2007). Further, plaintiffs seeking to enjoin enforcement must demonstrate that the selective enforcement "is part of a 'policy, plan, or a pervasive pattern.'" *Id.* at 1153 (quoting *Thomas v. County of Los Angeles*, 978 F.2d 504, 509 (9th Cir. 1993)).

Plaintiffs' briefing does not make their approach clear.[5] Therefore, the Court will address both potential types of violation. First, under current precedent, homeless individuals are not a suspect class. *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1108 (E.D. Cal. 2012) (citing cases). Plaintiffs' recitation of New Colossus by Emma Lazrus does not change that fact. While arguments that the unhoused represent a vulnerable group deserving of protection are well taken, the Court is bound by precedent and Plaintiffs have not brought a case that could adequately support homelessness as a protected or suspect class requiring strict scrutiny.

Applying rational basis review, the Court finds that the restrictions imposed by the Camping Ordinance are rationally related to the City's legitimate purposes. The City points out that it "is managing the homeless population's needs to rest, sleep, and lie against the housed population's interest in aesthetics, sanitation, public health, safety, and environmental quality." Def. Mot., ECF No. 51 at 37. Plaintiffs argue there is no rational basis for denying them the right to erect a cover from the elements and dispute that tents present a fire danger, claiming that "[o]f the 200 fires currently burning in Northern California and Southern Oregon, none were caused by nylon or protective coverings for people from the elements." Pls. Resp., ECF No. 67 at 30. Plaintiffs have not provided the Court with any support for their argument. Moreover, the Court agrees with the City's characterization of their duty. The City is required to consider the input of parents who want to play with their kids at parks, neighboring cities that share concerns for the greenway, environmental groups who have complained about debris build up, businesses and property owners who are concerned with their livelihood and property values, and taxpayers

---

[5] In the FAC, Plaintiffs allege selective enforcement, invoke fundamental rights, and raise that "homelessness is an arbitrary classification." FAC, ECF No. 40 at ¶¶ 93-95. In the Response, Plaintiffs allege targeted enforcement by Officer Kirkpatrick and include a plea to the courts for homeless individuals to be deemed a protected class. Pls. Resp., ECF No. 67 at 30-31.

frustrated with cleanup costs that yield no long-term solutions. *See* Mitton Decl., ECF No. 51, Ex. 30. These are legitimate concerns that form a rational basis for the Ordinance.

Likewise, the Court finds the City has demonstrated a rational basis for its Exclusion Ordinance. The Exclusion Ordinance allows the City to exclude individuals from a specific public area for unwanted behaviors. Such behaviors include arson, assault, harassment, sexual offenses, drinking in public, possession of a controlled substance, and other actions typically prohibited in common spaces—but they do not include prohibited camping and trespass. Thus, Plaintiffs merely engaging in the life-sustaining activities of sleeping, resting, or seeking shelter are not implicated by this Ordinance. In ruling on its constitutionality, the Honorable Benjamin Bloom of the Jackson County Circuit Court noted that the exceptions built into the Ordinance's language serve as safeguards to protect one's fundamental rights:

> The court determines that the Exclusion Ordinance survives
> constitutional challenge because although the Ordinance excludes
> individuals cited or arrested for an enumerated crime or violation
> from being in the downtown Medford exclusion zone for 90 days,
> the ordinance contains safeguards which render it constitutionally
> permissible. For instance a person subject to the Exclusion
> Ordinance may enter the exclusion zone to work or look for work,
> travel through the exclusion area, obtain health services, attend
> religious services, consult with an attorney or other legal
> professional, attend court hearings, go anywhere authorized or
> ordered by the court, attend public meetings, or otherwise exercise
> a constitutional right. The ordinance does not infringe upon the
> right to free speech, right to travel, or the right of assembly.
> Additionally, application of the Exclusion Ordinance is stayed if a
> person challenges an exclusion order. Finally, the Exclusion
> Ordinance contains provisions for a person to seek variances to the
> conditions of an exclusion Order.

Murdock Decl., ECF No. 52, Ex. 27. This Court agrees with Judge Bloom's reasoning. Plaintiffs raise a host of issues with the Exclusion Ordinance's associated hearing process but again, Plaintiffs do not provide the Court with any authority and lack sufficient evidentiary support for

their arguments. Without a fully supported challenge, the Court is inclined to echo the County and find the Exclusion Ordinance acceptable.

Second, to the extent Plaintiffs bring a selective enforcement challenge, they have not provided the Court with any evidence that the police were motivated by a discriminatory purpose, much less that the selective enforcement was part of a policy, plan, or pervasive pattern. The Court cannot find a genuine dispute of material fact exists without such evidence.

The Court recommends summary judgment be granted in the City's favor on Plaintiffs' equal protection claim.

## IV.    Substantive Due Process

The substantive due process clause of the Fourteenth Amendment forbids the government from depriving a person of life, liberty, or property when the government acts with deliberate indifference or reckless disregard for that person's fundamental rights. *Tennison v. City & County of S.F.*, 570 F.3d 1078, 1089 (9th Cir. 2009); *Porter v. Osborn*, 546 F.3d 1131, 1137-39 (9th Cir. 2008). A plaintiff establishes a substantive due process violation by showing the defendant deprived him of his life, liberty, or property and engaged in "conscience shocking behavior." *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006). An official's conduct may shock the conscience where the official acts with deliberate indifference or reckless disregard for the plaintiff's rights in situations where the official had the opportunity to deliberate. *Tennison*, 570 F.3d at 1089; *Porter*, 546 F.3d at 1137-39.

Plaintiffs couch this claim in terms of a dispute over "whether cover from the elements, insects, and animals is a 'certain life necessity.'" Pls. Resp., ECF No. 67 at 32. Rather than providing the Court with any authority for this proposition, Plaintiffs attempt to carry their summary judgment burden by arguing that "[t]he Court has not said and it is not established law

that covering from the elements and protection from predators is *not* a life necessity." *Id.* at 32 (emphasis added). Not only do Plaintiffs confusingly upend their legal burden at summary judgment, but they continue to misstate the Camping Ordinance. A "sleeping bag, bedroll, or other material used for bedding purposes, including materials used to keep warm and dry while sleeping" are allowed anywhere sleeping is allowed. MMC 5.257(1)(c). Under the Camping Ordinance, Plaintiffs are not deprived of cover from the elements. Plaintiffs also fail to demonstrate any "conscience shocking behavior" on the part of the City. Nothing has been presented to the Court as proof that the City acted with deliberate indifference or reckless disregard for Plaintiffs' rights, such that a genuine dispute of material fact could exist.

Because the record cannot support this claim, the Court recommends summary judgment be granted in the City's favor on Plaintiffs' substantive due process claim.

## V.    Procedural Due Process

Plaintiffs argue the City's Camping Ordinance fails to provide "sufficient notice such that a reasonable homeless person in Medford would understand what conduct is prohibited." FAC, ECF No. 40 at 31. The City moves for summary judgment on this claim, arguing, among other things, that it's difficult to simplify ordinances like this, that were drafted in response to complex case law and are subject to constitutional challenges. Def. Mot., ECF No. at 40. In response, Plaintiffs said only this: "For the reasons stated above regarding the essential nature of cover from the elements, Plaintiffs Procedural Due Process claim should also survive summary judgment." Pls. Resp., ECF No. 67 at 33.

Based on Plaintiffs' response, the Court recommends summary judgment be granted on this claim as well. Plaintiffs have not met their summary judgment burden: no evidence has been offered, no case law or statutes are relied upon, and no substantive argument is presented from

which the Court could find a genuine issue exists. Moreover, the Court agrees with the City. Complex problems often beget complex answers. It would not behoove local governments and policy makers to produce solutions only where they can be offered in simplistic terms. Nonetheless, this Court finds that, read plainly, the Camping Ordinance is clear. It will be the City's duty, like many others, to work with community members and advocates to distill the law into digestible messages that the general public will be able to access and understand practically.

## CONCLUSION

The Court is mindful of staying in its narrow lane of evaluating whether the recent City of Medford Ordinances, enacted in response to the homeless crisis, are constitutional. The Court has found they are. The Court does however encourage city leaders to not become complacent and continue to compassionately and collaboratively work with all public and private stakeholders to address the root causes of homelessness in our community. This includes, among other things, the dire need for more low-cost and subsidized housing as well as more addiction, mental health, and other specialized services. The City appears to be acting in good faith and with the recognition that we cannot criminalize our way out of the homeless crisis. There are no easy fixes and the City will require help from the local, state, and federal governments. This crisis plagues each member of our community. Although it may be felt in different ways, it commands the same level of responsibility from each of us.

## RECOMMENDATION

The Court recommends the City's Motion for Summary Judgment be granted. Plaintiffs have failed to meet their burden of demonstrating a genuine issue of material fact exists with respect to any of their claims.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Federal Rule of Appellate Procedure Rule 4(a)(1) should not be filed until entry of the district court's judgment or appealable order. The Findings and Recommendation will be referred to a district judge. Objections to this Findings and Recommendation, if any, are due fourteen (14) days from today's date. If objections are filed, any response to the objections is due fourteen (14) days from the date of the objections. *See* Fed. R. Civ. P. 72, 6.

DATED this _16_ day of _January_, 2024.

MARK D. CLARKE
United States Magistrate Judge

# APPENDIX

## 5.256 Civil Exclusion

(1)  Civil Exclusion Zones. Civil exclusion zones are designated to protect the public from those whose illegal conduct poses a threat to the public health, safety, and welfare. In accordance with the provisions of this section, the Chief of Police or designee may exclude any person who is cited to appear, arrested, or otherwise taken into custody for any offense listed in subsection (2) of this section within a civil exclusion zone. Nothing in this section shall be construed to authorize the exclusion of any person lawfully exercising free speech rights or other rights protected by the Oregon or federal constitution. However, a person engaged in such protected activity who commits acts that are not protected shall be subject to exclusion as provided by this section. Civil exclusion zones include the following places:

(a)  City Property. Any property owned or managed by the City, including but not limited to parks, greenways, buildings, parking lots, or other land or physical structures. A person shall only be excluded from the city property that the person receives a notice of exclusion for.

(b)  The Downtown District. Comprises the area bound by Bear Creek, the north right-of-way of Sixth Street, the west right-of-way of Oakdale Avenue, the north right-of-way of West Main Street, the west right-of-way of Laurel Street, the south right-of-way of West Eighth Street, the west right-of-way of Oakdale Avenue, and the south right-of-way of West Tenth Street (as shown on Map A).

(2)  Offenses; Penalty. A person is subject to civil exclusion for a period of 90 days from entering or remaining within a civil exclusion zone if that person has been cited to appear, arrested or otherwise taken into custody within a civil exclusion zone for any of the following offenses:

(a)  alcoholic liquor violations as provided in the Oregon Liquor Control Act, or Medford code sections 5.310, 5.350, 5.360, or 5.361;

(b)  any sexual offense, as provided by ORS 163.355 through 163.465;

(c)  arson or related offenses as provided in ORS 164.315 through 164.335 or reckless burning as provided in Section 5.272;

(d)  assault as provided in ORS 163.160, ORS 163.165, ORS 163.175, ORS 163.185, or Medford code section 5.105;

(e)  criminal mischief as provided in ORS 164.345 through 164.365 or Medford code section 5.270;

(f)  disorderly conduct as provided in ORS 166.025 or Medford code section 5.120;

(g)  discharge of weapons as provided in Medford code section 5.160

(h)  failure to control dangerous dog as provided in Medford code section 5.603.

(i)  graffiti offenses as provided in ORS 164.381 through ORS 164.386 or Medford code section 5.519;

(j)  harassment as provided in ORS 166.065 or Medford code section 5.130;

(k)  intimidation as provided in ORS 166.155 through 166.165;

(l)  marijuana-related offenses as provided in the Control and Regulation of Marijuana Act, the Oregon Medical Marijuana Act, or Medford code sections 5.652, 5.653, 5.705, 5.710, or 5.715;

(m)  menacing as provided in ORS 163.190 or Medford code section 5.110;

(n)  possession, manufacture, or delivery of a controlled substance or related offenses as provided in ORS 167.203, ORS 475.005 through 475.285, and ORS 475.752 through 475.980;

(o)  prostitution or related offenses as provided in ORS 167.007 through ORS 167.017;

(p)  public urination as provided in Medford code section 5.125, except if the conduct involves only urination on a permeable surface in a park or greenway;

(q)  recklessly endangering another person as provided in ORS 163.195 or Medford code section 5.115;

(r)  strangulation as provided in ORS 163.187;

(s)  theft as provided in ORS 164.015 through 164.140 or Medford code sections 5.291 through 5.298.

(3)  Violation.

(a)  If a person excluded from a civil exclusion zone is found within the boundary of the civil exclusion zone during the exclusion period, that person may be arrested for Trespass-Premises as provided in Medford code section 5.250. A person is not considered to be within a civil exclusion zone if the person is within an exclusion zone and the person is:

(i)  passing through the exclusion area;

(ii)  in the act of obtaining social, medical, or like services;

(iii)  in the act of seeking employment or performing work directly related to lawful employment;

(iv) attending a public meeting;

(v) attending a court hearing, meeting with an attorney or criminal justice personnel, or engaged in any activity ordered by a court;

(vi) in the act of filing an appeal to an exclusion notice issued under this section;

(vii) attending religious services or otherwise exercising a constitutional right.

(b) A person shall not be issued an exclusion notice for prohibited camping or for otherwise sleeping within an exclusion zone.

(4) Exclusion Notice. The Chief of Police is designated as the person in charge of civil exclusion zones for the purpose of issuing exclusion notices in accordance with this ordinance, and may authorize employees of the police department to issue exclusion notices. Written notice shall be given to any person excluded from a civil exclusion zone. The notice shall specify the area from which the person is excluded, the length of exclusion, the offense(s) the person is accused of violating, and a description of the offending conduct. Warnings of consequences for failure to comply shall be prominently displayed on the notice. The notice shall inform the excluded person of the right to appeal to the municipal court, and shall include information on the time limit to file an appeal and place to deliver the appeal. Unless otherwise provided in the exclusion notice, the term of exclusion shall take effect upon issuance.

(5) Appeal. A person receiving an exclusion notice shall have the right to a hearing to have the exclusion rescinded, the period of exclusion reduced, or to request a variance.

(a) The hearing request must be filed in writing to the Municipal Court Clerk at Medford City Hall within ten (10) days after receipt of the notice of exclusion. The hearing shall be conducted by the municipal court judge within ten (10) days of receipt of a request filed pursuant to this section; excluding Saturdays, Sundays, and holidays.

(b) The hearing may be rescheduled for good cause shown, but shall be scheduled no later than five (5) additional business days from the rescheduled request. If an appeal is timely filed, the period of exclusion shall be stayed, pending the outcome of the appeal. If the exclusion is affirmed, the remaining period of exclusion shall be effective immediately upon issuance of the municipal court's decision.

(c) The City shall have the burden of proving by a preponderance of the evidence the validity of the exclusion. If the municipal court finds by a preponderance of the evidence that the exclusion was based upon the conduct proscribed by subsection (2), and if the exclusion is otherwise in accordance with law, the municipal court shall uphold the exclusion. However, if the municipal court finds that the City has not met its burden of proof, or that the exclusion is otherwise unlawful, then the municipal court shall enter an order rescinding the exclusion. In the event that the municipal court finds that the City has met its burden of proof, but that the length or scope of the exclusion is unreasonable under the circumstances, the municipal court may issue an order shortening the length of

exclusion or allowing for a variance. The decision of the municipal court is final.

(6)  Variance.

(a)  The Court may in its discretion grant a variance to an excluded person at any time during the period of exclusion if the person:

(i)  presents a plausible need to engage in any non-criminal activity that is not associated with the behavior supporting the person's exclusion;

(ii)  establishes that he or she resides within an exclusion zone;

(iii)  presents a plausible need to obtain goods and services not otherwise available outside the exclusion zone to satisfy the person's essential needs.

(b)  The variance shall be in writing, for a specific period of time and only to accommodate a specific purpose, all of which shall be stated on the variance. The excluded person shall keep the variance document on his or her person at all times the person is within the exclusion area.

### 5.257 Prohibited Camping, Lying, and Sleeping.

(1) As used in this section:

(a) "To camp" means to set up or to remain in or at a campsite.

(b) "Campsite" means any place where any stove or fire is placed, established or maintained for the purpose of maintaining a temporary place to live, or where the use of any tent, lean-to, shack, or any other structure, or any vehicle or part thereof is placed, established or maintained for the purpose of maintaining a temporary place to live.

(c) "Bedding materials" means a sleeping bag, bedroll, or other material used for bedding purposes, including materials used to keep warm and dry while sleeping.

(d) "The Greenways" refers to the Bear Creek Greenway, the Larson Creek Greenway, the Lazy Creek Greenway, and the Navigator's Landing Greenway.

(e) "Vehicle camping in a lawful parking space" refers to a person experiencing homelessness utilizing a motor vehicle in a lawful parking space as a temporary place to live. The vehicle must be operational and must be moved at least every 24 hours. To fall within this definition, the parking space at issue cannot be adjacent to residences.

(f) "Personal property" means any item that can reasonably be identified as belonging to an individual and that has apparent value or utility.

(2) It is found and declared that:

(a) From time to time persons establish campsites on sidewalks, public rights-of-way, under bridges, and so forth;

(b) Such persons, by such actions create unsafe and unsanitary living conditions which pose a threat to the peace, health, and safety of themselves and the community;

(c) During high and extreme fire conditions, the Greenways and Prescott Park pose a unique fire danger due to dry brush and abundant fuel sources;

(d) Enforcing existing arson laws and burning prohibitions on an incident-by-incident basis alone on the Greenways and Prescott Park during high and extreme fire conditions does not provide sufficient protection to public peace, health, and safety under such conditions, because of increased fire ignition potential and the rapid rate at which fire spreads under such circumstances;

(e) It is difficult for emergency personnel to evacuate individuals camping on the Greenways or Prescott Park during a fire event;

(f) Wildfires on the Greenways and Prescott Park pose a severe threat to persons and property, including residents and property owners near those areas and persons experiencing homelessness within those areas;

(g) Camping, lying, or sleeping on a playground or sports field fundamentally undermines the public's ability to use that public property for its intended purpose;

(h) Camping, lying, or sleeping on or near railroad tracks, or in a manner that obstructs sidewalks prevents the public's ability to use that public property for its intended purpose and can in some situations result in imminent threats to life;

(i) This section's regulations are meant strictly to regulate the use of publicly owned property, and are not intended to regulate activities on private property; and

(j) The enactment of this provision is necessary to protect the peace, health, and safety of the City and its inhabitants.

(3) No person shall place or utilize bedding materials upon any sidewalk, street, alley, lane, public right-of-way, park, greenway, or any other publicly owned property or under any bridge or viaduct for more than 24 hours consecutively in a particular location, unless otherwise specifically authorized by this code, or by declaration of the Mayor in emergency circumstances, or by executive order of the City Manager pursuant to such declaration, or by declaration of the City Manager in the case of a severe event.

(4) (a) Except as set forth in subsection (4)(b) of this section, no person shall camp in or upon any sidewalk, street, alley, lane, public right-of-way, park, greenway, or any other publicly owned property or under any bridge or viaduct.

(b) The prohibition in subsection (4)(a) of this section does not apply to tent camping or vehicle camping in the following circumstances:

(i) If otherwise specifically authorized by any provision of the Medford Municipal Code;

(ii) By declaration of the Mayor in emergency circumstances, if so authorized by the declaration;

(iii) By executive order of the City Manager pursuant to such declaration, if so authorized by the executive order;

(iv) By declaration of the City Manager in the case of a severe event, if so authorized by the declaration; or

(v) If the City publishes on its website a written policy authorizing tent camping or vehicle camping on specific publicly owned properties, then tent camping or vehicle camping on such properties is lawful and permissible consistent with the time, place, and manner constraints contained within any such writtenand published City policy.

(5) No person shall camp, lie, sleep, or use bedding materials in any of the following circumstances, unless otherwise specifically authorized by this code, by declaration of the Mayor in emergency circumstances, by executive order of the City Manager pursuant to such emergency declaration, or by executive order of the City Manager pursuant to such declaration, or by declaration of the City Manager in the case of a severe event:

(a) On the Greenways or Prescott Park, during the period May 1st to September 30th in any calendar year, or at any other time if the Fire Chief or the Fire Chief's designee determines that a fire hazard exists;

(b) On a playground or sports field during hours of closure. Notwithstanding Section 5.255, lying or sleeping in a City-owned park during hours of closure is not prohibited so long as the individual is experiencing homelessness, is not on a playground or sports field, is not on a "school park" associated with a school, and is not violating any other subsection of this section;

(c) On areas underneath roadways or bridges that are not open to the public;

(d) On railroad tracks or within 15 feet of railroad tracks;

(e) On publicly owned property not open to the public, including but not limited to the Public Works Service Center and park areas temporarily closed for construction, repairs, maintenance, cleaning and similar activities;

(f) On streets, including planter strips, medians and parking spaces;

(g) On sidewalks, if by doing so, the person obstructs pedestrian traffic along the sidewalk or into private property and businesses adjacent to the sidewalk. For purposes of this provision, an individual obstructs pedestrian traffic if that individual, by

camping, lying, sleeping, or using bedding materials, reduces the path of travel to less than 36 inches;

(h) Within 20 feet of a privately owned parcel zoned for residential uses, or within 20 feet of a residential structure regardless of zoning; or

(i) Within the I.O.O.F. Eastwood Cemetery, or any other cemetery, mortuary, memorial park, or similar property.

(6) Except as provided in subsection (10) of this section, at least 72 hours before removing homeless individuals from an established camping site, law enforcement officials shall post a written notice, in English and Spanish, at all entrances to the camping site to the extent that the entrances can reasonably be identified.

(a) When a 72-hour notice is posted, law enforcement officials shall inform local agencies that deliver social services to homeless individuals as to where the notice has been posted. Any local agency, providing service within the City limits of Medford, desiring to be on this notification list must provide its name, address, telephone number, and name of contact person to the Medford Police Department, in writing, requesting notification.

(b) The local agencies may arrange for outreach workers to visit the camping site that is subject to the notice to assess the need for social service assistance in arranging shelter and other assistance.

(7) (a) All personal property at the camping site that remains unclaimed after removal shall be given to a law enforcement official, a local agency that delivers social services to homeless individuals, an outreach worker, a local agency official or a person authorized to issue a citation described in subsection (10) of this section, whether notice is required or not.

(b) The unclaimed personal property must be stored in a facility located in the same community as the camping site from which it was removed. For purposes of this section, the City of Medford is considered a single community.

(c) Items that have no apparent value or utility or are in an insanitary condition may be immediately discarded upon removal of the homeless individuals from the camping site.

(d) Weapons, controlled substances other than prescription medication and items that appear to be either stolen or evidence of a crime shall be given to or retained by law enforcement officials.

(8) The written notice required under subsection (6) of this section must state, at a minimum:

(a) Where unclaimed personal property will be stored;

(b) A phone number that individuals may call to find out where the property will be stored; or

(c) If a permanent storage location has not yet been determined, the address and phone number of an agency that will have the information when available.

(9) (a) The unclaimed personal property shall be stored in an orderly fashion, keeping items that belong to an individual together to the extent that ownership can reasonably be determined.

(b) The property shall be stored for 30 days during which it shall be reasonably available to any individual claiming ownership. Any personal property that remains unclaimed after 30 days may be disposed of or donated to a corporation described in Section 501(c)(3) of the Internal Revenue Code as amended and in effect on December 31, 2020.

(10) (a) The 72-hour notice requirement under subsection (6) of this section does not apply:

(i) When there are grounds for law enforcement officials to believe that illegal activities other than camping are occurring at an established camping site;

(ii) In the event of an exceptional emergency at an established camping site, including, but not limited to, possible site contamination by hazardous materials, a public health emergency or other immediate danger to human life or safety; or

(iii) When the campsite is located in the areas specified in subsection (5)(a) of this section, and the notice is placed during the time frame described in subsection (5)(a) of this section, or when in the discretion of the Fire Chief or the Fire Chief's designee, the Greenways or Prescott Park should be immediately closed for fire danger as described in subsection (5)(a) of this section or per Administrative Regulation 907.

(b) If a funeral service is scheduled with less than 72 hours' notice at a cemetery at which there is a camping site, or a camping site is established at the cemetery less than 72 hours before the scheduled service, the written notice required under subsection (6) of this section may be posted at least 24 hours before removing homeless individuals from the camping site.

(11) A person authorized to issue a citation for unlawful camping may not issue the citation if the citation would be issued within 200 feet of a notice required under subsection (6) of this section and within two hours before or after the notice was posted.

(12) Violation of subsection (3) of this section constitutes a violation. Violation of subsection (4) of this section consisting of vehicle camping in a lawful parking space constitutes a violation. Every day in which such violations occur constitutes a separate violation. A violation of subsection (4) or (5) of this section constitutes a crime, except for vehicle camping in a lawful parking space.